THE MACON AND WESTERN RAILROAD COMPANY, plaintiff in error, vs. MALINDA WINN, by her next friend, CICERO A. THARPE, defendant in error.

Courts will interfere cautiously with the verdicts of juries in cases of *tort*, merely on account of the excess of the damages. They will, nevertheless, set them aside, and send the case back for the consideration of another jury, where the amount is so extravagantly large as to leave no room to doubt but that the jury were governed by passion, prejudice, partiality or corruption.

Where the safety of a person is put in imminent jeopardy, by the gross negligence or want of ordinary care, by the servants of a railroad, and in attempting to escape injury, is seriously damaged, it is no relief to the company that the person misjudged as to the danger, unless the plaintiff acted from a rash misapprehension as to their true situation.

Case, and motion for new trial, in Bibb Superior Court. Tried before Judge POWERS, at November Term, 1857.

This was an action on the case, brought by Malinda Winn,

The Macon and Western R. R. Co. vs. Winn.

a minor, by her next friend, Cicero A. Tharpe, against the Macon and Western Railroad Company, to recover damages for injuries received by plaintiff, from the negligent running of their cars. The case was submitted to a special jury on the appeal, who found for the plaintiff seven thousand dollars. Whereupon, defendant moved for a new trial, which the presiding Judge refused, and defendant excepted. All the facts necessary to a full understanding of the points adjudicated, are stated in the opinion of the Court, pronounced by Judge Lumpkin, in the concurring opinion of Judge McDonald, and in the dissenting opinion of Judge Benning.

Cole; and Nisbet, for plaintiff in error.

Baily; Whittle; and Trippe, *contra.*

*By the Court.*—Lumpkin, J. delivering the opinion.

When this case was up before, one of the grounds of complaint was, the excessive damages awarded by the jury; the verdict then, as now, being for $7,000. As the Court determined to grant a new trial for other reasons, they deemed it best to express no opinion upon this, but refer it back for the consideration of another special jury, under the law as laid down by the Court. There is no complaint that the rules of law governing the case, were not properly given on the last trial, and still, the jury have found the same amount. And the only question which we propose to examine now, is, whether the verdict shall be set aside for excess? As to the exceptions taken during the progress of the trial, we are unanimous that there is no merit in them.

As to what constitutes negligence or reasonable care, the position of this Court has invariably been, that whether the facts relied upon to establish the one or prove the exercise of the other, are true, is to be left to the jury; and that each case must depend upon its own circumstances. And this

doctrine, notwithstanding the conflict of opinion in some of the State Courts, is maintained by Mr. Pierce, citing in its support, the decisions of this Court, and numerous authorities, both English and American. See *Treatise on American R. R. Law*, 282 *et seq.*

What, briefly, is the truth of this transaction, to be fairly deduced from the testimony?

In December, 1851, Mrs. Winn is returning from a visit to Crawford county, to her home, near the Macon and Western Railroad, in the neighborhood of Forsyth, Monroe county. She is traveling in her rockaway, with four children, with a negro driver, and team of mules. She had reached a point where the public highway crossed obliquely the railroad track, and was within a few yards of the latter, when the down train of cars from Atlanta to Macon, emerged from a cut, some two hundred yards or more above the crossing, and was seen coming with its usual speed of some eighteen or twenty miles an hour. Situated as the parties were in the carriage, the train appeared to be almost directly in front of them. Mrs. Winn directed the boy to halt. The evidence of the employees of the company is, that the driver seemed to be reining up his mules; and it is likely that there may have been a momentary pause at this juncture. The boy, however, who is proven to have been sober, and a highly trustworthy servant, calculating the chances, decided promptly that his safest course was to push across the road, ahead of the train. Perhaps, the preponderance of proof, from actual measurement, is, that he might possibly have turned round and retreated to a more remote position; but considering the nearness of the fence on his left, and other obstructions, this is somewhat questionable.

It has occurred to me, that looking to the safety of the family alone, perhaps the wisest course would have been to have let out the passengers, leaving the mules and the vehicle to the chances. But when it is recollected, that it was a female and four helpless and dependent children who occupied the

carriage, and that, likely. the train was not more than fifteen seconds in reaching the crossing, from the time it was first discovered, it will be readily perceived what little time there was for deliberation.　Upon a calm and dispassionate view of the whole facts, sound judgment will approve of the determination of the driver; and that was, to cross the road ahead of the train.　It is conceded on all hands, that this was entirely practicable, but for the unforeseen misadventure which thwarted the attempt.　When the mules were on the track, they obstinately refused, from fright or some other cause, to proceed forward, in despite of the most strenuous efforts and appliances used by the boy, to urge them forward. And then it was that the whistle was sounded, the steam reversed, and the breaks were put on; but it was too late.　The driver was struck on the head by the smoke pipe of the engine and killed; the mules were cut loose from the rockaway and ran off; the carriage was taken up by the cow-catcher, and the wreck, after scattering the fragments all along by the way, was carried two hundred and seventy yards before the train was stopped.　Mrs. Winn was found at some distance below the crossing, on the side of the road; the children, and ruins of the rockaway, were on the cow-catcher; the head of one of the children, swears one witness, was through the bars of the cow-catcher.　One of the children expired immediately; two others survived a short time and died.　Mrs. Winn's arm was broken, and she otherwise greatly bruised; and the serious injury inflicted on Malinda, to compensate for which this suit is brought.　Her skull was fractured back of the ear, and the bone pressed in upon the pupil of the eye.　The deformity is apparent and permanent.　How far it affects the sight, or may hereafter impair the health of the girl, cannot be well ascertained. Being matter of opinion, it must be more or less uncertain.　If the bony substance protruding into the socket of the eye-ball, continues to grow, it may be attended with melancholy consequences.　As it is, it is rather a matter of medical conjecture and speculation.

Under these circumstances, is the remuneration so excessive as to make it obligatory upon this Court to control the discretion, both of the jury and of the Court below, and direct a new trial ?

It has been argued that, inasmuch as there was fault on both sides, that the misconduct of the plaintiff should mitigate the damages; and, at first, I was inclined to adopt this suggestion. In a proper case, I am inclined to think the principle is a correct one. But is it clear that there was culpability on the part of the plaintiff? If so, in what did it consist ? It is not very apparent. To talk about inexcusable negligence on the part of June, the driver, or extraordinary carelessness, is to falsify the truth of this tragedy. At least, was not this a case where it was peculiarly the province of the jury, to compare and weigh all the facts, and come to a conclusion, not by any artificial rules, but by the ordinary principles of reasoning?

But how stands the question as it respects the colliding train ?

In the first place, approaching a crossing as it was, was it not the obvious, as well as the legal, duty of the servants of the company, to have checked their train at once, so as to have it under their control, in anticipation of the possibility even of difficulties? But waiving this, and conceding all that they claim on the other side, when they first saw the carriage so near the road, admitting it had halted, could they have fulfilled the requirements of the most ordinary care, without holding up at once, to prevent mischief? Could they have known that the driver would not stir, but endeavor to maintain his position, it was great imprudence, to say nothing worse of it, to have rushed forward the engine, regardless of results. From the effects of this conduct, and in this view of the case, they can never escape. Adopting their own version of the affair, they put the persons in the carriage in imminent danger, and did nothing whatever to contribute to their safety, or facilitate their escape.

But this is not all. After the collision occurred, they ran on two hundred and seventy yards, without taking up, with the vehicle and its victims thumping on the rail, when it is in proof by the lamented Foote, that they could have brought the train to a dead stand at the distance of one hundred and fifty yards! For they were ascending an up-grade of thirty-seven feet to the mile, as testified to by Col. Whittle and others! And when and where the damage to this family was done, does not appear; possibly, the whole of it during the last one hundred and twenty yards, unnecessarily consumed in arresting the train.

We will not believe this catastrophe was wantonly perpetrated. Humanity forbids it. The engineer, conductor, and all, were paralyzed at the appalling spectacle, the magnitude of the mischief they had inflicted. If they decline accepting this explanation, or apology, all I can say is, they have failed to furnish any other, or better.

We return to the main point. Is this verdict so large as to demand of this Court, in the exercise of its supervisory power, to control the discretion of the Circuit Judge, and send it back for the consideration of a *third* jury?

There is, as I conceive, a legal principle involved in this case, which should have much to do in deciding this question. It is plain, that from the reckless conduct of the servants of the company, Mrs. Winn was placed in a state of positive and palpable peril. Had the driver stood still, the party might have escaped unhurt. But might he not have reasonably concluded, that he might be incapable of managing his mules? He had to adopt the alternatives, of crossing the road, risking an upset by turning shortly and suddenly round, or remaining still, at certain peril. He could not have anticipated the stubbornness of the mules. Suppose he acted unwisely, and thereby unintentionally contributed to the sad misfortune, ought the consequences to be visited upon the sufferers? We hold not, unless the driver's conduct resulted from a rash apprehension of danger, which

did not exist, and the injury can be traced or attributed to this miscalculation. And we recently recognized this doctrine, in the case of *Mrs. Polk, adm'x, &c. against the South-Western Railroad Company*, not yet reported. The Books are full of it.

While, then, we reassert the right of the Court to interfere for the relief of a party against a despotic verdict, in cases of *tort*, believing as we do, that it is absolutely necessary for the sound administration of justice; still, a Court should be cautious in setting aside a verdict, merely for excess. It is not enough that it be, in our opinion, too high. We cannot rightfully substitute our judgment for that of the jury. In this case, the party most grievously injured, has been kept out of the compensation to which she has been entitled since 1851. Heavy expenses have been incurred to prosecute this litigation. Two special juries have found the same sum. Is it so " outrageously excessive," in the language of some of the authorities, as to force the conviction, that the jury have been actuated by improper influences, passion, partiality, prejudice or corruption ? Does the verdict strike every body so at the first blush ?

Had I been on the jury, I might have preferred a different admeasurement of damages; and yet, I do not hesitate to say, that had the child been my daughter, I would not accept the money for the injury.

Judgment affirmed.

McDONALD J. concurring.—

The only point of disagreement among the members of the Court in regard to the judgment rendered in this case, is on the ground taken in the motion, that the damages found by the jury are excessive. The jury, on the trial, found all facts in favor of the plaintiff in the Court below, to entitle her to damages. There is no complaint that the principles

of law, applicable to the cause, were not fully placed before the jury on the trial by the presiding Judge, and fairly explained to them. Those principles were lucidly laid down in this case when before this Court at Macon, January Term, 1858. 19*th Ga.* 440. The jury having determined the facts upon which the plaintiff was entitled to damages in her favor, it became their duty to assess the damages. They did so, and found a verdict for seven thousand dollars. I shall confine what I have to say to the single ground of the excessiveness of the damages. I am not called to determine whether I should have rendered the verdict for the amount of damages given, if I had been of the jury who tried the cause. It is scarcely possible to find any two men, whose minds at the first impression would arrive at the same conclusion in such a case. There are no fixed criteria by which a calculation can be made.

The verdict must be the result, partly, of calculation upon expenses actually incurred, loss of time, the nature of the injury, as it may disable the plaintiff temporarily or permanently, from pursuing a profitable or necessary employment, estimating the value of that employment; and partly of the opinion or judgment of the jury, of the damages to which the plaintiff may be entitled, for the endurance of the bodily pain and suffering, the injury inflicted, its permanent or temporary effect upon her health; its liability to produce other diseases, and render it necessary to employ, for life or other shorter period, attendants necessary to her existence or comfort, which would not have been necessary but for the injury. It is the province of the jury to do all these things, and it is only when it is done in a manner to produce the impression on the judicial mind that their conduct must have been the result of prejudice, passion, partiality or corruption, that the Court can interfere by awarding a new trial on the ground merely that the damages assessed are excessive. The authorities say that the damages ought not to be

weighed in a nice balance, but must be such as appear, at first blush, to be outrageous, and indicate passion or par'ality in the jury. *Tidd's Practice*, 909, *and authorities there cited*; 7 *Ga.* 204; 10*th Ga.* 45. The best men are liable to be prejudiced or prepossessed for or against a party or a cause, and they may unconsciously act under the influence of such prejudice or prepossession in discharging the gravest duties. If jurors, unconsciously or on purpose, allow themselves, in forming their verdict, to be so controlled, the verdict cannot be in accordance with justice; but it does not follow that the Court having the power to grant a new trial shall, upon conjecture, impute an improper motive because the verdict is larger than they would have rendered, but the amount of the verdict must seem so to outrage justice as to produce a strong impression that it could not have been rendered on any other hypothesis than that the jury were misled by passion or prejudice, or had been corrupted. Can such an inference be drawn in this case? The cause had, on a former occasion, been submitted to a special jury, who rendered a verdict for the same amount. A new trial was moved for, because the damages found were excessive, and on other grounds, which was refused by the presiding Judge in the Court below. Error was assigned on that judgment, and this Court reversed it on those other grounds, and did not notice, in its judgment, the ground of excessive damages. It would seem that the Court did not, on that occasion, regard the verdict as furnishing that strong evidence of passion, prejudice or partiality, on the part of the jury, as at once impressed it with its gross injustice, or it would have alluded to it in some way. Again, two special juries have rendered a verdict for the same sum, upon a full consideration of the case.

However my own opinion might have been in considering, with them, the evidence in the cause, I am not prepared to declare that the amount of damages found is so enormous and exorbitant as to authorize me to infer that the jury were

either governed by passion, were prejudiced or corrupt in rendering their verdict. In considering the ground of excessive damages, I have looked at i, in every aspect in which it was presented to my mind, and have enquired whether, if the suit had been against a natural person instead of a corporation, the jury would have rendered a verdict for the same amount. It is difficult for me to say it is probable they would, and yet I cannot say they would not. Be that as it may, I will remark that juries ought to bear in mind that in such cases, it is their duty to enquire into the injury inflicted on the one hand, and sustained on the other, and to award damages accordingly, without reference to the hand which inflicted it. The plaintiff in such cases is entitled to no more damages than he has sustained or is likely to ensue from the injury, by whomsoever inflicted. The wealth or poverty of the defendant cannot be given in evidence to augment or diminish the damages, and if it cannot be given in evidence, it cannot be considered by the jury. Such suits for damages are suits for injuries to the person of the plaintiff, and not for the violation of the public law.

The immediate author of the wrong and all in combination with him, aiding and abetting, are liable, *criminaliter*, for their acts, if intention to commit it can be connected with the acts; and such intention may be inferred from the recklessness of their conduct. It ought to be remembered, ever, that criminal justice must not be administered on the civil side of the Court, but that while all the damages likely to ensue from an injury suffered, to the person wronged, ought to be awarded to him, they ought not to be unreasonably increased under feelings of resentment towards the person who inflicted it. I will not discuss this matter further, but simply express my concurrence in the judgment rendered, for the reasons assigned.

BENNING J. dissenting.—

I differ with the Court on one point in this case.   I think, that the damages were excessive; the Court thinks, that they were not.

Mrs. Wynn', the mother of the child suing, gives the following account of the hurts received by the child.   "The skull of plaintiff was badly fractured, considering that she is yet alive.  Her body was bruised nearly black.  Her skull was broken in, just above and behind her left eye.   Her left eye has sunk away, in consequence of the injury on the head. She cannot see with her left eye now, as much as she could six months ago.   It is more sunken, is apparently smaller, and her mind is not as good as it was last year.   And I know of no cause to attribute the loss of sight and memory to, but the fracture on her skull.  Above, and in front of, the dent made on her head, immediately above the eye, a hard bony substance seems to be forming, and grows continually.   It is larger now than last year, and larger than a partridge egg.   She is disfigured for life; and that disfiguration increases, and her growth is retarded."

The hurts were received in 1851, and this account of them, was given in 1857, six years afterwards.   At the time of the hurts, the child was six years old.

This, the mother's account of the hurts, makes them out worse, than any other account does.

Dr. Burney, swearing when the child had become twelve years old, says; " I have not detected any injury to her mind, since the accident.  Have seen her very often."   "I think the eye has been injured, but I don't know that the pupil of the eye has been injured, except as it keeps out the rays of light.  I am of the opinion, that it has remained stationary, since I first saw it.   The tendency of nature, I should think, would be to improvement.   But the disfiguratic ι is very apparent, and easy to be seen at this time.   It could be seen across this room, (fifty feet,) by any person whose at-

tention was called to it." "I think the diminished size of the eye, the greatest deformity. It is more of a deformity than the bump, I think." "The books all say, that such wounds on the head, make a person more subject to epilepsy, paralysis, and neuralgia. I think the damage dimishes as she grows older. I think she is more subject to nervous diseases."

Two other physicians, Drs. Hammond, and Nottingham, substantially confirmed this account of Dr. Burney's.

The child had never had "epilepsy," or any other disease resulting from the hurts.

For these hurts pure and simple, the jury gave the child $7,000 in damages. The jury did not take into the account the physicians' bills; or, any other special expense; or, the loss of time. The physicians' bills were paid by the Railroad Company; it does not appear, that there was any other special expense; the time of a child six years old, is worth nothing. None of these things, then, went to swell the verdict.

The child's promise of capacity or ability, for usefulness, was not impaired at all, or if, at all, only, in a slight degree. Six years has elapsed and no ill effects to mind or body, had developed themselves, the three physicians being the judges, In six years, a child of six, "out grows" such hurts; at least, we may say so with much confidence, if during all that time, no ill effect of the hurt shows itself. True, the physicians thought, that there was an increased susceptibility to nervous diseases, and that this had not entirely vanished, although it was constantly vanishing.

There was, then, little or no depreciation in the child's promise of usefulness, of ability to serve itself and others, ability to exert its rights and perform its duties. Consequently, there could be, from this source, little or no accession to the volume of the verdict.

There was no element of shame or mortification. It was not a case of seduction, or of spitting in the face, or of any

such degrading injury.   It was a case of accident, not even a case of malice.

What particulars then were there out of which, to make the amount of the verdict?   I see but two.   1st. The pain and suffering undergone by the child; 2d, and the deformity of the head and eye—attended, perhaps, by a slight impairing of the power of vision.

And is it true, that this last ought so be counted?   Is there any law which gives damages, for the impairing of mere good looks?   But say that there is.

There were these two particulars, then, out of which, to make the amount of the verdict.   Could so great an amount as that of the verdict, $7,000, be rightly made out of these two particulars?   I cannot think so.

What is the criterion of damages?   Compensation—a restoration of the injured party, to the condition which he was in before the injury.   This pays his debt; and it cannot be, that he can have a right to more than his debt.

What then is compensation?   It is certainly true, that there are many cases in which, it is difficult to say what would be compensation; but there are some in which, it is not difficult.   I mention one.   Suppose the wounds to be such, as to render the injured party useless—unable to do any work; and that by his work, he had been making $350 per year, before the injuries.   Now paying him an equivalent for his lost ability to work, and paying the expenses of healing him, and paying him something for the pain he suffered, would be compensation.   And $350 per year, paid to him, for his life, would be ample pay for the first, and the third, of these items, considering the accidents to which, the ability to labor is exposed, and, the certainty, that that ability diminishes to a point, with the diminishing years of life.   It would be more than is generally paid; more probably than the cases warrant   "In one case, Parke B. said: It would be most unjust, if whenever an accident occurs, juries were to visit the unfortunate cause of it with the utmos

amounts which they think an equivalent for the mischief done. Scarcely any sum could compensate a laboring man for the loss of a limb, yet you do not in such a case give him enough to maintain him for life." *Wayne on Dam.*, 264, citing *Armsworth vs. South Eastern Railway Co.*, 11 *Jur.* 760.

We shall, at least, then, be safe in saying, that $350 per year, for the man's life, would be compensation to him, for his whole injury—the expenses of healing his wounds, excepted.

What the man, then, would be entitled to recover in damages, would be no greater a sum, than one which would produce an annuity of $350, for his life. And that would be a sum considerably less than $5,000, and varying, as the man was older or younger; $5,000, being a sum which, at seven per cent. per annum, would raise an annuity of $350, *perpetually.*

Thus, then, we have an idea of what would be compensation in this supposed case in which, the injury is so great, as to deprive the party of all ability to work.

Of course, it must follow, that a less sum would be a compensation to him, in the case in which, the injury was less.

Now, let us argue from this supposed case, to the actual case. Let us ask what would have been the amount required, as a compensation to this child, had her injuries been so great, that they would have rendered her useless for life—unable to do any sort of work or business? And we may safely answer, that it would not have been, a greater amount, than one sufficient to balance the value of her lost ability for work and business; to pay the expenses of healing the injuries; to pay something, for the pain and suffering resulting from the injuries, and, something for the disfiguration of face.

What would be the annual value of this lost ability for work and business? $350? That is more, I think, than such ability of women in the average, is rated at; more than it usually commands. Say then $350.

Then $350, per year for the child's life, would be equal to the value of her lost abi: 'y for work and labor for usefulness. It would be more, a good deal more; for during both the earlier, and the later, years of her life, this ability would not be worth as much as $350 per year, because during the earlier, she would be too young, and during the later, too old. The excess would, I think, we may safely say, be sufficient to pay the something due for the pain resulting from the injuries, and the something due for the disfiguration of face. We need say nothing of the expenses of heal: .g the injuries, as there were no such expenses in this, the actual case.

What sum would produce this annuity of $350, for her life? A sum of $5,000, would more than do it. That sum at seven p r cent. per ' ꞯnum would produce an annuity of $350, in perpetuity. But say $5,000.

Then, $5,000 would be a sum sufficient to compensate her, for the whole injury—even supposing it, an injury so great as entirely to have destroyed her capacity for every kind of work or business.

$7,000, therefore, would have been a sum too great, by at least, $2,000, even if the case had been this extreme one of destroyed capacity for everything useful.

But, it was not this extreme one. Her capacity for usefulness, was hardly impaired at all. In a degree how much greater, then, must $7,000 have been too large. Yet the jury gave her $7,000.

The pain suffered by the child, was, I have no doubt, very great; the disfiguration of her face, was, certainly, considerable, but yet, not so great as to shock the beholder. I could, therefore, sanction the allowance to her of a liberal sum to pay for the two things; but I cannot sanction an allowance of $7,000. Suppose she had lost the eye; or, had lost both arms; or, both legs; what would the $7,000 have had to be raised to? $15,000 ?—$50,000 ? Surely not less

than these sums. Now, is a verdict fraught with such results as these, to be sanctioned? I think not. Sensibility, if admissible at all in a court house, is surely when admitted, to be kept within some bounds. I think, that the verdict was much too large.

Did not the ___ have the right to give something, as "punitive" damages? In my opinion, they did not. The doctrine of "punitive" damages, is one for which I cannot see any warrant in the law. Suppose it true, that the injury is such, that a part of it *is* to the public, the other part being to the injured man, does it follow, that he is entitled to the compensation due to the public's part? Does it follow, that he is entitled to anything, but the compensation due to his own part? Has he the power to release the compensation due to the public's part? Surely not: but if he has not, ought the injuring party to be subject to the payment of this compensation twice; once, to the injured party, and once to the public. What is it to the injured party, if the public is never paid?

In respect to this doctrine of the punitive damages, I think that Greenleaf is right and Sedgewick wrong. See *Sedde. Meas. Dam. App. No.* 1, *and No.* 2.

But surely, the only cases in which punitive damages are admissible, if admissible in any, must be, cases bearing some analogy to criminal cases; to cases to make which, there must " be, an union, or joint operation of act and intention, or criminal negligence." And what analogy does this case bear to a criminal case. In this case, a corporation is the party sued. And what has the corporation done of a criminal nature. It appointed a board of directors; a board consisting, as far as appears, of prudent and circumspect men ; and this board appointed a president and other officers, also, prudent and circumspect men, as far as appears; and these appointed the sub-officers, who were in charge of the train, when the accident happened. Now, surely, it would be the merest extravagance, to say, that this accident was the result

of "*intention,*" or "*criminal* negligence," in the corporation. Whilst, therefore, it may be quite true, that the corporation is liable for the negligence of these, its sub-officers, I do not see how it can be liable, in·*punitive* damages.

Hitherto, I have been going on the assumption, that the whole negligence which caused the accident, was in the corporation, (by its agents,) and, that no part of it, was in the child, or (the same thing,) in her mother; and, even on that assumption, the conclusion to which I have come, is, as I have said, that the verdict ought to have been for some amount much smaller than $7,000; but if that assumption was not true; if the negligence which produced the accident, was shared in by the child too, (by her mother,) then, I think, that this smaller amount ought itself, to be reduced; ought to be reduced in proportion to this, the child's share, of the negligence.

Now, the evidence, as I think, shows the accident to have been the result of a negligence on both sides; a negligence that was less on the side of the child, but still, that was on her side too.

I will refer to the evidence.

Mrs. Wynn, the mother of the child, says, "I saw and heard the engine and cars before they reached the crossing, and I directed the driver to stop until they passed; but he said he thought he could cross first, and attempted to do so."

"The driver drove on until the mules hitched to the carriage, got on the track of the road and then stopped. The driver whipped them to get them off, but they stood still, looking in the direction of the engine, when it struck the carriage."

"If the driver had followed my directions, the injury would have been avoided. He did not stop at all, but said when I directed him to stop, that he would cross before the cars, and hastened on to do so."

This is what Mrs Wynn said, when examined the first time, which was, in 1853; when examined the second time, which was, in 1857, she said; "I do not think the driver

The Macon and Western R. R. Co. vs. Winn.

could have safely driven otherwise, than he tried to do. He might have stopped the mules, for they did not then see the engine."

"Whose fault it was, I leave for others to determine. I have stated all the truths and facts as nearly as I can. I did think, for a long time, the negro was wrong, until I saw the place, and examined it, afterwards."

"As soon as the engine was discovered coming, the driver hurried up the mules, and used every exertion to effect a crossing, by whipping and encouraging them, but they refus- to move as soon as they got on the crossing, and turned their heads, looking at the engine."

"The driver had time enough to clear the crossing, and move out of the way of the engine, had not the mules baulk- ed."

"I called on the driver, to stop when within twenty feet of the crossing, but he urged the mules on, and said it would not do to stop where we were; that there was no way to get out of harm, but by crossing; that, the mules were not used to cars."

"When I first saw the engine coming, the mules and car- riage were going along the public highway, from Macon to Forsyth, and where, the public and the said road run nearly parallel, but converge, hemmed in by a fence off on the left, which runs up to the point of intersection of the highway and Railroad; and, by the Railroad on the right, (the car- riage had no chance to turn, right or left.) When in this position about twenty feet from the Railroad, as before sta- ted, I saw the engine about two hundred yards off, coming from Forsyth to Macon, almost fronting us."

It thus appears, that when the carriage was twenty feet from the crossing, Mrs. Wynn, and the driver saw the engine approaching two hundred yards off. What then, at this time, was the dictate of prudence to them? To go on, or, not to go on? Not to go on, I think. Prudence would say, I think, that the driver should stop and turn back, if turning

back was practicable; if it was not, that he should stop, dismount from his seat, go to the head of his mules, and take them by their bridles.    And Mrs. Wynn herself, doubtless, thought so too, at the time, and "for a long time" afterwards, because ; she told the driver "to stop;" she "did think for a long time," that he was "wrong."    True, on visiting the spot "a long time" afterwards, she changed her mind, and came to the conclusion, that the driver in going on, was not "wrong."    But still, I think the first opinion entitled to more respect, than the second, for, the first was formed, on perception, the second, on memory ; a memory that had had "a long time," to fade in ; and, then, when the first was formed, no reasons existed, to bias her judgment, but when the second was formed. powerful reasons to bias it existed.

If we say, that there existed ground as to the driver, for a reasonable expectation, that he would be able to cross the track before the engine came up, and that it was not at all imprudent in him to act on such reasonable expectation, and attempt to cross, we have equally to say, that there existed, as to the runner of the engine, this same ground, and that it was, in like manner, not at all imprudent in him to act on such reasonable expectation, and delay to check the engine's speed, till too late.    If we say this, however, we make the case, one free from negligence on either side.

I think, then, that some of the negligence, was on the side of the child.

More of the negligence, I also think, was on the side of the corporation ; I shall not stop to state my reasons for this opinion.

I assume it then, as true, that negligence existed on both sides, and therefore, that a negligence on both sides, caused the acccident and loss ; the share of the negligence on the one side, causing a part of the accident and loss, proportioned to the quantity of that share; the share of the negligence on the other side, causing a part of the accident and loss, proportioned to the quantity of that share.

This assumed, as true, the first question will be; whether the plaintiff, (the child) was entitled to recover at all; the next, whether, if entitled to recover at all, she was entitled to recover, for the *whole* loss, or, only, for the *part* not resulting from her own negligence, viz: the part resulting from the negligence of the corporation. I address myself to these questions.

Of all the maxims of the law, one of the most general, is, that for every wrong, there is a remedy.

Now, if I do what hurts another, it will be a wrong to him, even, although, he himself be doing the very same thing. If I beat a man with a stick, it will be a wrong to him, even although he himself be beating himself with a stick. So, if I am negligent and my negligence goes to produce an accident to his loss, it is a wrong to him, although, it may be true, that he, also, is negligent, and that his negligence also. goes to produce the same accident.

It would seem *to* result, from this maxim, then that the child, through herself, not free from negligence, would have a right of action, and be entitled to recover something.

With this result, agree, I think, the decisions of this Court; decisions growing out of this same accident. In *Macon and Western Railroad Co. vs. Davis*, (18 *Ga.* 686,) the language of the Court is, " it ought to be left to the jury to say, whether notwithstanding the imprudence of the plaintiff's servant, the defendant, could not, in the exercise of reasonable diligence, have prevented the collision." This is as much as to say, that the plaintiff, even though himself, " imprudent," (negligent,) might recover, if the defendant could, by the exercise of reasonable diligence, have prevented the collision.

In the present case, when it was up before, the Court recognize the same position, saying, " we went further, and held, that notwithstanding the plaintiff was not free from fault, still if the defendants in the exercise of due care, could have prevented the injury, they would be responsible. We adhere to that decision." (19 *Ga.* 442.)

With these two decisions, agree, two English decisions, as far as they go. The first is, that in *Smith vs. Dobson*, (3 *Mann & Grang.* 59.) In that case, these were the facts: While the plaintiff's "barge was crossing the river, the defendant's steamboat, the Water Lily, passing rapidly up the river, created a swell, which filled and sunk the barge, occasioning à loss of fifty tons of coal, of the value of £80" "The plaintiff's barge was insufficiently manned, having on board only one man and a boy, the former of whom was in liquor;" "the barge was overloaded, and also badly trimmed, being seven inches deeper in the water on one side than the other."

"The jury returned a verdict for the plaintiffs, the foreman saying, "We give only £20 damages against the defendants, inasmuch as we think, the blame is not attributable to them alone, and because the barge was not properly manned."

The defendants moved for leave to enter a verdict for them, or, for a new trial. The motion was overruled.

Now, here there was much negligence on the side of the plaintiff, and yet the verdict for the plaintiff was sustained, it being a verdict however, which was for only *one-fourth* of the plaintiff's loss; a fact which will be of use on the second question.

Very similar to this, is the other English case, which is that of *Raisen vs. Mitchell and others*, 9 *Carr and Payne* 613.

There are still other English cases which, I think, do not differ from these two, in any thing substantial; as *Butterfield vs. Forrester*, (11 *East.* 60;) *Bridge vs. The Grand Junction Railway Company.* (3 *M. & W.* 244.)

And, in the Admiralty Courts, the rule, where there has been blame on both sides, is, "that the loss must be apportioned between them." *Ang. on Carr.*, sec. 642.

In answer then to the first question, whether the plaintiff in the present case, though herself guilty of some negligence,

was entitled to recover at all, we may say, I think, that she was.

Assuming, then, that she was entitled to recover something; the second question comes up, which is; was she entitled to recover an equivalent for the *whole* loss, or only an equivalent for the *part of the loss resulting from the negligence of the defendant.*

"Damages." *Damna* in the common law, hath a special signification for the recompence that is given by the jury to the plaintiff, or defendant," (demandant,) "for the wrong the defendant hath done unto him." *2 Coke. Litt. 257, a.*

According to this definition, the defendant is liable in damages, only for the wrong *he* has done. And that a defendant's liability does not extend beyond this, would, indeed, seem to be, a self-evident proposition.

Now, in the present case, the "wrong" which "the defendant" did, to the plaintiff, consisted in the defendant's *share,* in the common negligence.

It must follow, then, by this definition of Coke's, that the plaintiff would be entitled to recover of the defendant, damages, only for this, the defendant's *share,* in the negligence ; that is, would be entitled to recover of the defendant, damages, only sufficient to pay for the part of the loss, due to the defendant's share in the negligence.

The answer to the question, then, if, to be governed, by such a fundamental principle, as this definition of Coke's, would seem to be, that the plaintiff, if herself, guilty of any part of the negligence from which the loss resulted, would not be entitled to recover of the defendant, damages for the whole loss, but only for that part of it, which was due to the defendant's share in the negligence. Say the whole negligence was as, four, (which would make the whole loss also, as four,) and, that the plaintiff's part of the negligence was as one, and, the defendants part, as three ; then, the plaintiff, would be entitled to recover of the defendant, damages equal, not to the whole four parts of the loss, but, to only three

parts of the loss; the fourth, part of the loss, due to her own part of the negligence, she would have to bear herself.

This then is the result from the definition of damages. And what is there against it, in decisions. The decisions in the above cited cases of *Smith vs. Dobson,* and *Raisen vs. Mitchell,* are, certainly, as far as they go, in favor of the result.

In the former of these two cases, the loss amounted to £80. The jury gave £20 in damages; that is, they gave one-fourth only of the loss; and they expressly put their verdict, on the ground, that "the blame" was "not attributable to the defendants alone."

This verdict was sustained; and the natural and obvious ground to sustain it on, is, that on which it was put by the jury, viz: That the blame was not attributable to the defendants alone. And this is the ground on which, two of the Judges, (*Tindal C. J. and Erskine J.,*) it seems, did put their opinion sustaining the verdict.

In the latter of the two cases, (also a case of collision of vessels,) the loss was at least £543 13s. The jury returned a verdict for only £250. "Tindal C. J. asked the jury how they made up their verdict. "The foreman answered, there were faults on both sides." "Tindal, C. J., then you have considered the whole matter." "The foreman replied in the affirmative." "*R. V. Richards,* submitted to his Lordship, that the facts which the foreman of the jury had stated entitled the defendant to a verdict."

"Tindal, C. J.—No. There may be faults to a certain extent."

In this case, the sum found by the jury, was not quite equal to one half of the loss. And, as in the other case, it was found, expressly on the ground, that "there were faults on both sides;" and the finding was sustained; and, seemingly, on the same ground.

The rule in Admiralty, as stated by Lord Stovell, is; where both parties are to blame, or where there has been want of

The Macon and Western R. R. Co. vs. Winn.

due diligence or skill or both sides; in such case, the rule of law is, that the loss must be apportioned between them, as having been occasioned by the fault of both of them." *Ang. on Car.*, sec. 642. "*Apportioned*" would seem to imply, that the part of the loss to be borne by either, is to be in *proportion*, to his part of the fault. If this be what was meant, then this rule is in precise accordance with what was above deduced from Coke's rule; and with the verdicts in the two cases just noticed; if what was meant, was, that in the case put, the loss was to be divided *equally* between the parties, then the rule is such, that it will be in accordance with that deduction, only in cases in which, the parties share equally in the fault; and, in other cases, it will merely, more or less approach accordance with the deduction.

From what has been said, I think, I am justified in concluding, that if there is, in cases like the present, negligence on both sides, the plaintiff is not entitled to recover damages for the *whole loss*, but only for the *part* of the loss, *which results from the defendant's share* in the negligence; in other words, that the plaintiff is entitled to recover, only such an amount of damages, as shall bear to the whole loss, the same proportion which, the defendant's share in the negligence, bears to the whole negligence.

The present, as I have shown, I think, is a case of negligence on both sides, though of a negligence less on the side of the plaintiff, than on the side of the defendant. If it is, then supposing me right in the above conclusion, the plaintiff was not entitled to recover of the defendant, damages equal to the whole loss, but, only, damages equal to the part of the loss, which resulted from the defendant's share in the negligence; that is to say, if the defendant's share in the negligence was, three-fourths, then the plaintiff was entitled to recover of the defendant, only a sum equal to three-fourths of the loss.

And this is my answer to the second question.

VOL. XXVI.—18

The Macon and Western R. R. Co. vs. Winn.

What effect is this answer with the other, to have on my opinion as to the excessiveness of the verdict? I will state.

Even on the hypothesis, that the child, (or its mother,) was free from fault, the conclusion, to which I came, was, that the verdict should have been of a less amount than it was. The child not being free from fault, it must follow from the answers to these two questions, that I consider even this less amount, to require reduction; a reduction proportioned to the child's share in the fault, or negligence. And so, I do.

As the case is, the plaintiff's share in the negligence, was *less*, than the defendant's. Suppose the case, had been, that it was as great, or greater, would the same principles apply in that case, and give her the right to recover; and, to recover an amount proportioned to the defendant's share in the negligence? Why not? Even in that case, some portion of the loss, would be due to the defendant's part of the negligence; and for that portion, Coke's definition would require the defendant to recompense her. So, would the two English cases; for they were cases in which, the verdicts were for less than half the loss, and were so, because the jury thought, that the defendant's share of the negligence, was less than half the negligence, in other words, thought that the plaintiff's share in the negligence, was more than half of the negligence. In Admiralty, the loss is apportioned in all cases, and therefore, in cases in which, the plaintiff's part of the blame, is as great as the defendant's or greater. The difference between the two classes of cases; the class in which the plaintiff's share of the fault is the less, and the class in which it is the greater, or as great, is one, not of kind, but merely of degree. Consequently, whatever rule or principle, is true of the one class, ought, equally, to be true of the other. And, in the abstract, what has more to commend it, than this; every part of the cause of a loss, ought to bear is part of the loss; or, more briefly, the fault ought to bear the loss.

The principle, that the fault ought to bear the loss would require, that in cases of negligence in both parties, apportionment ought to take place, even when the loss falls on both parties. And in Admiralty it does; but, perhaps, with some limitation.

And what objection is there to this principle? I see none. If denying an action, in these cases, to the sufferer, is a proper punishment, to him, it is an improper reward, to the other party; if denying an action to the sufferer, will be a discouragement to future negligence in him, it will be an encouragement to future negligence in the other party.

But surely there can be no objection to this principle, in the case in which the plaintiff is not one of the guilty parties, but merely a person who occupies the relation of passenger or bailor of goods, to one of those parties. Surely he ought to be allowed to sue the other guilty party, and make him respond in proportion to his guilt. Yet there are some cases, that refuse even him the permission. See *Ang. on Car.* sec. 636.

My conclusion, then, is, that the damages were excessive; 1st. That they were over proportioned to the wounds or injuries, and, therefore, that they should suffer one reduction on that account; 2dly. That they were given to a party whose own negligence had a share in producing the wounds or injuries, and, therefore, that they should suffer a further reduction on that account.