2607, 2608.   DABBS *v.* ROME RAILWAY AND LIGHT CO., and *vice versa.*

1. Where a motorman in charge of an electric car sees apparent or probable danger of an accident to a person on the highway adjacent to the track, or by the exercise of reasonable care could see that danger is imminent, caused by the approach of the car, it is his duty to use reasonable care to avoid the accident. What would be reasonable care would be a question for the jury, under the facts of the particular case.

2. A motorman in charge of an electric car who observes, or in the exercise of reasonable care could observe, a vehicle containing several occupants near the track, and that the animals pulling the vehicle are frightened at the approach of the car, and are acting in such manner as to lead a

person with ordinary prudence to apprehend danger of a collision between the car and the vehicle, is bound to bring the car under such control that it can be stopped, if necessary, to prevent a collision or injury to the occupants of the vehicle.

3. If the approach of the car and the consequent fright of the horse attached to a vehicle in close proximity to the track cause one in the vehicle to jump therefrom in order to escape apparent or imminent danger, it would be for the jury to determine whether the emergency did in fact exist, or was reasonably thought by the person so jumping to exist, and whether the act of jumping, under all the circumstances, was contributory negligence.

4. There is conflict in the evidence, and fair and reasonable inference therefrom of liability, and the court should not have directed a verdict for the defendant.

DECIDED OCTOBER 14, 1910.

Action for damages; from city court of Floyd county—Judge Hamilton. March 17, 1910.

W. B. Dabbs brought suit against the Rome Railway & Light Company to recover damages for the homicide of his daughter. The petition, in substance, made the following allegations: The plaintiff's deceased daughter was unmarried, was 22 years of age, and was motherless at the time of her death. He was dependent on her and she contributed to his support. On August 14, 1908, in the evening, she was riding in a carriage drawn by two mules driven by a neighbor, who, with his wife and two children, occupied the front seat, the decedent and two of her sisters being on the back seat. At a point on what is known as Cave Spring road, in Floyd county, the vehicle was being driven in a general southerly direction, alongside the track of the defendant. The road at that point, between the track of the defendant and the fence running alongside the road, was 18 feet wide, and from the point where the killing occurred the track extended south straight for 350 yards, and then curved in a westerly direction. It was dark, and the car of the defendant had its electric headlight and other lights on, and came around the curve above mentioned, towards the vehicle in which the decedent was riding. The mules drawing the carriage became frightened at the car, and, as it approached, became more and more frightened. The car approached at a dangerous rate of speed, about 30 miles an hour, and the servants and agents in charge of the car saw, or by the use of ordinary care could have seen, that the team was frightened, but they made no effort to stop or check the car. As the

car approached the carriage the mules began backing away from it, thereby pushing the rear end of the carriage towards the track, and the decedent, seeing the rapidly approaching car and seeing that the carriage was about to be backed against the car, undertook to spring from the carriage. She stumbled and fell in the way of the car and was run over and killed. The defendant was negligent, in that its agents, seeing the frightened condition of the team, made no effort to stop the car. It was negligent in that its agents in charge of the car were running it in the narrow road at such a high rate of speed. It was negligent in that its car was not equipped with air-brakes, or with any other means of quickly stopping or checking the car, except a friction brake. It was also negligent in not having prescribed any rules regulating the speed of its cars at this place. This petition was demurred to, and the plaintiff, by an amendment, alleged, that the headlight of the car cast a bright light 200 yards ahead; that everything in this light could be plainly seen; that the team was in this light and could be seen for this distance; that on account of the narrow roadway and the frightened condition of the team, it was likely and probable that the team would push or pull the carriage upon the track in front of the moving car and thereby cause a collision between the car and the carriage; that the roadway was straight, as described in the original petition, and the motorman in charge of the car could, by exercising ordinary care and looking ahead, have seen the narrowness of the roadway and the frightened condition of the team, and could have seen that a collision was imminent, but made no effort to stop or check his car, although running at the great rate of speed above mentioned, and although he could have seen that a collision was probable; and in these particulars the defendant was negligent; that the motorman failed to keep a lookout ahead and failed to see that a collision was probable; and in this the defendant was negligent; that the defendant was also negligent in approaching the team at such a high rate of speed, without knowing that it could be safely passed, and without exercising any care to prevent injury in case the team took fright and the decedent was put in a perilous position; that the friction brake of the car was not so powerful as air-brakes, and required 50 yards to stop the car while running at the rate of speed at which it was then running,

and the motorman knew this, but nevertheless made no effort to get the car under control; and in these particulars the defendant was negligent; that the schedule called for a rate of speed, at that place, of fifteen miles per hour, but this rate of speed was being greatly exceeded; and this is alleged as negligence; that the defendant was also negligent in running a car equipped only with hand friction brakes, on a down-grade, as the track was, at the place of the killing, at such a high and dangerous rate of speed, in and along a public road which was only 18 feet wide, and especially in undertaking to pass· a team coming towards the car, at such speed, under all the circumstances alleged.

To the petition as amended the defendant filed a general and special demurrer, which was overruled; and in the cross-bill of exceptions this judgment is assigned as error. At the conclusion of the evidence in the case, a verdict was directed for the defendant; and to this the plaintiff excepted.

The evidence for the plaintiff established the substantial allegations of the petition. The driver of the carriage in which the deceased was riding, his wife, and the two sisters of the deceased, who were sitting on the rear seat of the carriage with her, all agree in their testimony that the mules became frightened at the rapid approach of the car; that as the car approached the vehicle the mules "surged backwards and forwards with the surrey, and when the car got right in front of them and threw the light in their eyes, they stood on their hind feet and made a leap;" that the car passed in about two feet of the surrey, close enough to touch it; that the car was running at a very rapid rate of speed and the motorman made no effort to stop it, although he could have plainly seen for some distance the frightened condition of the mules and the imminence of the danger of a collision with the vehicle. One witness testified that the motorman appeared to be looking straight at the mules while they were "cutting up," but did not slacken the speed of the car, or make any effort to do so. The evidence for the plaintiff is silent as to how the decedent got out of the surrey, but the inference is very clear that, seeing the approach of the car and the frightened condition of the mules, which were backing the vehicle towards the track, she made an effort to get out of the vehicle, and fell on the track, where she was struck by the car. The testimony of the motorman

and the conductor was in sharp conflict with that of the witnesses for the plaintiff. They testified, that the car was not running at an unusual rate of speed; that the condition of the track was fairly good; that when the motorman first saw the carriage he was about 200 feet from it; that the mules or the animals pulling the vehicle did not seem to be frightened at all, and when the car was in about 15 feet of the carriage, the decedent jumped out of the carriage on to the track and was hit by the car; that the car was then running about 15 miles per hour, or possibly a little more; that it was running at the usual rate of speed; that there was nothing in the conduct of the mules to indicate any danger; that the motorman put the brakes on the car about the time he saw the decedent jump out of the carriage, and it all happened in an instant; that the carriage was about 8 feet from the track, and the decedent jumped from the carriage on to the track; and that the mules were not frightened either before or after the accident.

*Lipscomb, Willingham & Doyal,* for plaintiff.

*Dean & Dean,* for defendant.

·HILL, C. J. (After stating the foregoing facts.)

The above is substantially the evidence for both sides. Assuming that the evidence for the plaintiff is the truth of the transaction, does it present a case for the determination of the jury, and not for the decision·of the court as matter of law? We think there can be but one answer to this question. The evidence should have been submitted to the jury. To support this conclusion, it is not necessary to quote all the evidence or to give in detail each allegation of negligence, or the proof pertinent thereto. The case made by the plaintiff shows a traveler on the highway on which a street-car track was also located, driving two mules to a carriage occupied by a half dozen people. These mules became frightened at the approach of the street-car, and as the car approached nearer, they became much more frightened, making apparent not only a possible, but a probable accident. This condition of the mules could have been seen by the motorman for 300 yards. Indeed, the motorman himself testified that he did actually see the team for 200 yards away. He nevertheless made no effort to stop the car or to prevent the impending accident, but ran by the frightened team at a rapid rate of speed, in such close

proximity that, according to the testimony of one of the witnesses, the passing car could be touched by the occupants of the carriage.

Learned counsel for the defendant, in support of his contention that no liability was shown by the evidence for the plaintiff, relies upon the decision of this court in the case of *Southern Ry. Co.* v. *Flynt*, 2 *Ga. App.* 162, 170 (58 S. E. 374, 378). That decision does not support this contention. In that case this court said (p. 170): "While we do not think the law imposes upon railroad companies the duty of keeping a lookout or of giving warning to travelers on an adjacent highway of the approach of trains, yet when danger to such traveler is discovered, it then becomes a duty to use care to avert an injury, such care as the then situation would make it practical and possible for the railroad in the proper conduct of its business to use." It is true the evidence of the motorman in this case is positive that he discovered no danger to the travelers on the highway from the approach of his car, yet the testimony of the four witnesses in the carriage is positive that the mules were frightened at the approach of the car,—that they were plunging and trying to back the carriage towards the track; and the evidence of the motorman is that he did see this vehicle for 200 yards on the highway adjacent to the car track. Would not the jury have been authorized to conclude, from this testimony, that he did discover the danger? If he did discover the danger, then it was his duty, under the decision of this court relied upon by the defendant, to use care to avert the injury,—such care as the then situation made it practical and possible for him to have used. If he could have stopped the car or slackened its speed, it was his duty to have done so. And right here it may be observed that there is a vast difference between a train of cars propelled by a locomotive on a track and one car under the control of a motorman. In one case it would be difficult to stop the train to avert an injury. In the other case it might not be difficult to stop the car to avert an impending danger or accident. In the case of *Perry* v. *Macon St. R. Co.*, 101 *Ga.* 410 (29 S. E. 308), the Supreme Court says: "It is undoubtedly the duty of the motorman, in propelling a car through the public streets, to notice the presence of other vehicles and pedestrians ahead of his car, and at all times be watchful to see that the way is clear; and where

he has reason to apprehend danger, or should in the exercise of ordinary care become cognizant of danger, he should regulate the speed of his car so that it may be quickly stopped, should occasion require it." See also, in this connection, *Brunswick & Birmingham R. Co.* v. *Hoodenpyle*, 129 *Ga.* 174 (58 S. E. 705); *Electric Ry. Co.* v. *O'Connor*, 99 *Ga.* 62 (24 S. E. 405); *Metropolitan Street R. Co.* v. *Powell*, 89 *Ga.* 602 (16 S. E. 118). In the case of *Cleveland* v. *Street R. Co.* (Kentucky Court of Appeals), 11 L. R. A. (N. S.) 853, cited by learned counsel for the plaintiff in their most excellent brief, the facts are very similar to those in the case now under consideration; and in that case the court held that "the motorman in charge of an electric car, who observes a lady seated in a buggy near the track, with the actions of the horse such as to lead a person with ordinary prudence to believe that there is danger that the vehicle will be backed upon the track, is bound to bring the car under such control that it can be stopped entirely if necessary to prevent a collision." In the Kentucky case it was contended that there was no negligence on the part of the electric company, because the plaintiff did not get on the track until too late for the car to stop; and counsel for the defendant in the present case make the same contention. A portion of the decision of the learned judge of the Kentucky Court of Appeals is so pertinent, and in our opinion expresses so clearly the law applicable to the facts of that case, as well as to the facts of this case, that we think it appropriate to quote it. "It is insisted that the court should have instructed the jury that appellee was not entitled to recover damages resulting from the collision, unless they should find that at the time the motorman first saw, or, by the exercise of reasonable care, should have seen, that the buggy was about to be backed on the track, he could have stopped his car in time to prevent the collision. Under this view of the case, although the motorman may have seen the horse rearing and prancing and lunging backwards and forwards, he was under no obligation to slacken the speed of his car, or anticipate that the vehicle might be backed on the track. This does not express the measure of duty exacted from motormen in charge of electric cars. They can not wait until the danger of collision is imminent, or the person or vehicle is put in actual peril, before exercising ordinary care to prevent an

accident. It is true that the street-car service is for the benefit of the public and can not fulfill its legitimate purpose unless it is operated with some degree of celerity. Nor is it necessary that a car should be slowed up every time a horse or team betrays signs of uneasiness. But in weighing the duties of a motorman in cases of this character, it is necessary to consider the circumstances and conditions that present themselves calling for the exercise of reasonable care and good judgment upon his part. Here a lady was seated in an open buggy standing by the side of the track, in plain view of the approaching car. The motorman, if keeping a reasonable lookout, could have seen from the actions of the horse that he was liable at any moment to become uncontrollable and place the occupant of the buggy in peril of her life by backing the buggy in such a position that it would come in contact with the car, and the actions and movements of the horse were such as would lead a person of ordinary prudence to believe that there was danger of the vehicle being backed upon the track. It was therefore the duty of the motorman, observing this condition of affairs, to have slackened the speed of his car or have stopped it entirely, if necessary, in order to prevent a collision that should have been anticipated. Thus, a motorman who sees a child walking on or near the street-car track would be held to a higher degree of care than if an adult were in the same position, and might reasonably expect that there would be more danger of collision when a vehicle was being driven by a lady, and the horse was restless and excitable, than there would be if a teamster was driving a wagon by the side of the track." And the court further on says that the high speed of the car and the failure of the motorman to take any action to lessen it until it was too late to prevent the collision, although he saw, or could have seen, the peril in which appellee was placed in time to have checked his car or stopped it, thereby avoiding the injury, manifested such a reckless disregard of the right of appellee as to warrant the infliction of exemplary damages. We can not doubt that the principle of law announced in the case from which the above quotation is taken is sound, and its applicability to the facts of this case is apparent. If the testimony of the plaintiff was the truth of the transaction, it was clearly the duty of the motorman, when he saw that the mules near the track were frightened and that the carriage was

filled with occupants, most of them women, to have checked his
car in time to have prevented the accident. If the mules were in
such a condition of fright as described by the driver and the
other occupants of the vehicle, and if the motorman could, by the
exercise of ordinary care, have seen this condition of fright and the
impending danger of an accident, and if he could, by the exer-
cise of reasonable care, have prevented it, it was plainly his duty to
do so. These were all questions peculiarly for solution by the
jury.

Counsel for the defendant insists that in order to recover from
the railway company for a horse becoming frightened at the noise
of a running train, it must appear that the noise was unusual and
unnecessary. Of course this is unquestionably true, but this prin-
ciple is not controlling as to the facts of this case, for here the
main ground of negligence alleged and relied upon is not the noise
produced by the running of the car, or the fright of the team by
the speed of the car, or the headlight of the car, but the gist of
the charge of negligence is that the motorman saw the frightened
condition of the team, or by ordinary care could have seen it and
the probability of a collision in ample time to have taken some
precaution to prevent it, but that he nevertheless made no effort
at all to prevent the accident which was imminent, and carelessly
continued to approach at a rapid rate of speed. All the other al-
legations of negligence which were proved by the testimony in
behalf of the plaintiff were incidental, and gave emphasis to this
main allegation of negligence on the part of the motorman as
proved by the evidence for the plaintiff.

It is contended also by the defendant that the testimony in
behalf of the defendant, that the deceased jumped out of the car-
riage on to the track, which was not disputed, showed such con-
tributory negligence on her part as to prevent her father from re-
covering. It has been frequently decided by the Supreme Court
of this State, and can not reasonably be denied, that if one, by
his negligent or wrongful act, causes an emergency wherein an-
other apprehends a danger from the consequences of such negli-
gent or wrongful act, and does an act to avoid the consequences,—
such as jumping from a running car to avoid an impending col-
lision, and acts of like character,—this does not constitute con-
tributory negligence which can be set up by the party whose con-

duct caused the emergency. If the decedent saw that the mules were frightened by the approaching car, that the motorman in charge of the car made no effort to stop it, and that there was danger of a collision by the backing of the carriage on the track in front of the rapidly approaching car, and, in her effort to avoid the consequences of the motorman's negligence, she endeavored to get out of the carriage and stumbled on to the track in some unaccountable manner, this was not an act of which the defendant can take any advantage. *Southwestern R. Co.* v. *Paulk,* 24 *Ga.* 356; *Macon & Western R. Co.* v. *Winn,* 26 *Ga.* 250; *Macon & Western R. Co.* v. *Johnson Co.,* 38 *Ga.* 409; *Smith* v. *R. Co.,* 83 *Ga.* 671 (10 S. E. 361); *Richmond & Danville R. Co.* v. *Dickey,* 90 *Ga.* 491 (16 S. E. 212); *Simmons* v. *R. Co.,* 92 *Ga.* 658 (18 S. E. 999); *A. K. & N. Ry. Co.* v. *Roberts,* 116 *Ga.* 505 (42 S. E. 753). And in the case of *Central R. Co.* v. *Sears,* 59 *Ga.* 437, it is held that this would be true although in fact such emergency did not actually exist, if it was believed in good faith that it did exist. But whether the emergency existed, or whether the decedent believed that it did exist when in fact it did not exist, are questions for the determination of the jury. *Central R. Co.* v. *Sears,* supra; *Roach* v. *R. Co.,* 64 *Ga.* 635. The contention of the learned counsel for the defendant that the death of the plaintiff's daughter was solely attributable to her own gross negligence in jumping out of the carriage, and that in fact the evidence indicated a suicidal intent on her part, necessarily presents questions for the determination of the jury. Considering the case as a whole, we think the conclusion is irresistible that the court erred in deciding, as a matter of law, that under no fair and reasonable inference from all the evidence could the jury have found a verdict in behalf of the plaintiff, and in directing a verdict for the defendant.

It follows, from what we have said in discussing the questions raised by the main bill of exceptions, that the judgment on the cross-bill of exceptions must be *affirmed,* and that on the main bill of exceptions *reversed.*