MACON AND WESTERN RAILROAD COMPANY, plaintiff in error, *vs.* MARGARET A. JOHNSON, defendant in error. The same parties *vice versa*.

1. If a passenger on a railroad be injured by a collision of the trains, and the evidence shows that, though the company (or it agents), was guilty of negligence, yet the party injured could, by the exercise of ordinary diligence, have avoided the consequences to himself of that negligence, he is not entitled to recover any damages from the company.

2. If, in such a case, it appears that both the defendant and the plaintiff were guilty of negligence, and it does not further appear, from the evidence, that the deceased could, at the time of the injury, have avoided the consequence to himself of the negligence of the railroad company, or its agents. he is entitled to recover; but it is the duty of the jury to lessen the amount of their verdict in proportion to the negligence and want of ordinary care of the passenger.

2. Where a suit is brought by a widow, for the homicide of her husband, under the 2920th section of Irwin's Code, and there is no fault proven

on the part of the deceased, the rule to be adopted for estimating the damages, is: The pecuniary damages to the wife from the homicide, to be ascertained by inquiring what would be a reasonable support, according to the circumstances in life of the husband, as they existed at his death, and as they may be reasonably expected to exist in view of his character, habits, occupation and prospects in life, and when the annual money value of that support has been found, to give, as damages, its present worth, according to the expectation of the life of the deceased, as ascertained by the mortuary tables of well established reputation.

4. The opinon of one, who for many years has been a railroad superintendent, in a matter within the scope of his employment, stands upon the footing of the opinion of an expert; but he cannot give his opinions of the object of a railroad company, with which he had no connection, in putting up a particular notice on the doors of its cars.

5. Though opinions are not generally evidence, yet, when the truth sought to be ascertained is matter of opinion, a witness, not an expert, may give his opinion, if he states the facts upon which it is based.

6. A card published by the passengers immediately after a railroad collision, is not evidence, as part of the *res gestœ*.

7. Railroad companies may make reasonable rules for the conduct of their passengers, and a rule that passengers must not stand upon the platform of the cars, is such a reasonable regulation.

8. If such a notice be proven to have been posted in large metal letters, upon the doors of the passenger cars of a railroad company, a passenger will be presumed to know the rules, and if that knowledge be denied, the burden of establishing such want of knowledge is upon the party denying it.

9. In this case, this Court feels constrained to reverse the judgment of the Court below, overruling the motion for a new trial, made by the plaintiff in error, on the ground that the Court erred in its charge to the jury, as to the rule for estimating damages in such cases, and on the further ground, that the verdict of the jury was decidedly against the weight of evidence, if not as to the absence of ordinary diligence on the part of the deceased, to escape the consequence to himself from the plaintiff's negligence, certainly as to the amount of the damages, in view of the rule that where both parties are at fault, the damages are to be diminished in proportion to the negligence and want of ordinary care of the party injured.

Case. Motion for new trial. Decided by Judge COLE. Bibb Superior Court. November Term, 1867.

Arthur W. Johnson was a passenger upon the night passenger train from Macon to Atlanta, over the railroad of said company. That train was followed by a freight train.

Macon and Western Railroad Company *vs.* Johnson.

Some portion of its engine having broken, the passenger train was stopped. Whilst it was stopped, Johnson stood upon the platform of one of its cars, and there remained till the freight train, running into the passenger train, killed him. Thereupon, his wife sued the company for damages.

The main question being, who was in fault, the parties read the evidence of very many persons. The plaintiff undertook to show that these trains were out of schedule time ; that the officers of the company had violated some of its rules, and that the signal-man, sent back to give notice to the freight train, had gone back too short a distance, etc. On the other hand, the company undertook to show that Johnson was drinking ; did show that he stood upon the rear platform of the rear car of the passenger train, etc. One of the witnesses said : " It is my opinion Johnson could not have been in his seat at the moment of collision, but was at the door or on the platform." The plaintiff's attorneys objected to this answer as evidence, but the Court received it. It was shown that on the doors of each passenger car was a plate, with raised letters, as follows : " *Passengers must not stand on the platform."* GEORGE W. ADAMS, who had long been conversant with other railroads, but who was never employed on the Macon and Western railroad, was allowed, over the defendant's objection, to testify that on railroads with which he had been connected, the object of such notices on the doors of the passengercars, was only to keep passengers off the platforms when the train was in motion. He, also testified that a collision could not occur where both trains are off schedule time, without fault on the part of the railroad company. This, too, came in over the defendant's objections. None of the passengers who were inside the cars were damaged seriously, if at all, and quite a number of the witnesses testified that they believed that had Johnson been inside, he had not been injured. To these opinions, the plaintiff objected, but her objections were overruled. But when the defendant proposed to read, from the answers of one of its witnesses, that " it was the general opinion of passengers that all was done that could be done to prevent the

accident, and that there was a card issued and signed by many of the passengers, exonerating the agents of the company from all blame," the Court rejected that answer.

The card alluded to was in the following words:

"A CARD.

"MACON AND WESTERN RAILROAD, October 27th, 1865.

"We, the undersigned, passengers of the train which left Macon on the night of the 26th of October, and which train was run into by a freight trian following, causing the death of A. W. Johnson, of Baker county, and wounding A. J. Rogers, after careful investigation, we feel satisfied that the conductors, engineers, and men on the train, did all in their power to prevent this accident."

"The unfortunates were on the platforms of the first and second passenger cars. None others were injured seriously. We have great reason for gratitude for so marvelous an escape from instant death."

It was signed by seventeen of the male passengers. It had been published in the Macon Telegraph, and the original had been lost. It was made and signed on the spot, just after the catastrophe, but how long after, did not appear. (The company's attorneys, in the bill of exceptions, say it was fifteen or twenty minutes after the catastrophe.) Under these circumstances, they offered it in evidence, but the Court refused to allow it to be read to the jury.

We pass to the question of the amount of damages.

The plaintiff's attorneys asked a witness the following questions: "In your answer to a former set of interrogatories propounded to you by plaintiff, you stated that you thought the services of Arthur W. Johnson were worth $1,500 00 or $2,000 00 *per annum*, did you mean to say that his services were worth that sum, exclusive of the support of his family?" The question was objected to as leading. The Court held it was not leading, and the witness answered that he meant he could make that much "clear of the support of his family."

Johnson was shown to have been between thirty and thirty-four years old when killed; most of the witnesses said about thirty-four. He had been a merchant, etc., and the witnesses who testified as to his income, put it from $1,500 00 to $2,500 00 *per annum*.

The returns of his property for taxation, made by himself, for a series of years, were as follows:

| | | | | | |
|---|---|---|---|---|---|
| For 1854,.........$ | 865 00 | | For 1861,..........$14,715 00 |
| " 1855,......... | 530 00 | | " 1862,.......... 13,590 00 |
| " 1856,......... | 1,300 00 | | " 1863,.......... 18,612 00 |
| " 1857,. ....... | 2,900 00 | | " 1864,.......... 24,760 00 |
| " 1858,......... | 3,950 00 | | " 1865,..........No Return. |
| " 1859,......... | 10,987 00 | | " 1866, his estate, 4,450 00 |
| " 1860,......... | 13,044 00 | | |

The inventory of the real and personal estate, made by his administrators, footed up $4,801 50. He acquired something by his marriages. Two witnesses estimated this as high as $3,000 00, another said $2,000 00, by his first marriage, and he did not know how much by his second, which occurred in 186–. He was shown to have been industrious, of good habits generally, etc.

To arrive at the *quantum* of damages from these *data*, JOHN M. BOARDMAN and CHARLES T. McCAY were examined as experts. Boardman testified that he had been, since. 1854, a life insurance agent; had examined "Bartlett's Commercial Tables," and found them correct; that it contained a table of annuities, which was correct, and recognized as authority; that they were founded on the Carlisle Tables, which were gotten up at Carlisle, England, and generally received as authority by insurance men; that from these tables, counting interest at seven per cent., and allowing nothing for parts of annual income being added to the capital, he calculated the value of the life of a healthy man, thirty-four years old, upon an annual income of $2,000 00, to be $22,-749 57; of $700 00 income, to be $7,962 35; of $50 00 income, to be $568 73.

Charles F. McCay's testimony was as follows: The first question was to show his experience, etc., in such calculations, and the response to it, was as follows: " I was professor of mathematics in the University of Georgia, and in the State College of South Carolina for many years, and since 1849, have been actuary or mathematician to The Southern Mutual

Life Insurance Company. While I was at Athens and Columbia, I had the libraries enriched with all the standard works on the statistics of human mortality, and devoted much attention to the subject. I prepared, at various times, articles on these subjects, for Hunt's Merchant's Magazine, which have received commendation from the best judges in the United States. Last year, I was invited by the superintendent of the Insurance Department of the State of New York, to give him my opinion of the proper method for valuing the liabilities of their Life Insurance Companies, for my answers to which, I have received his thanks, and I subjoin the approval of the same from Mr. Bradley, actuary of the Mutual Benefit Life Insurance Company, which is one of the largest in the Union. I regard myself, therefore, as qualified by my education and studies, to give reliable answers to any question connected with life contingencies, especially in the South, where the rate of mortality is probably greater than in the North, as is shown by the experience of the Southern Mutual Life Insurance Company, to which I have devoted careful attention:

"NEWARK, N. J., March 27, 1866.

"HON. WILLIAM BARNES:

"DEAR SIR:—I only saw, and for the first time, a few days since, your circular as to the method of valuing policies. I think the first answer of Mr. McCay is one of the best considered and simple statements of the matter I have seen. It corresponds very closely with my own views. The formula of obtaining values used by me, is

$$V = 1 - \frac{1 + a_{m+n}}{1 + a_m}$$

"I first prepare a table of logarithms of $1 + a_x$, got by the formula 1 log. $N_{x-1}$—log. $D_x$. The calculation is then easy and very accurate.

"This formula, of course, gets the value of the policy at the age $m+n$, when the premium is just due, and not yet paid.    "Yours truly,

JOSEPH P. BRADLEY."

Macon and Western Railroad Company *vs.* Johnson.

The second interrogatory was: "A person is killed by the running of railroad cars on the road, who is thirty-four years old, and who has a family that he supports; his services are worth, annually, to his family, say from $1,500 00 to $3,000 00; that is, his services produce, annually, the average of these sums. Now, what sum in gross, would, in money, be equivalent to those depending on such person for the loss of this life?"

*Answer.*—"The answer to this question depends, I think, on several other things besides the value of an annuity on the life of the deceased; for 1st, if the deceased had lived, his earnings would be partly consumed in his own support; and 2d, the earnings would not probably be continued the same until the end of life—as when old age had overtaken him, he would not be as able to labor.

"As to the first, the share that would have been consumed in his own support, I would remark that when a man's income is three, four, five, or six hundred dollars , all is usually consumed in the support of himself and family, and about a fourth or fifth of this, is usually his own expense. If he receives $1,000 00 or $1,500 00, he spends more, but lays by something.

"If he earns a larger sum, his savings are usually larger. The expenditures on his own support, when he receives $2,250 00, are probably less than a fifth. But I shall estimate them at a fifth in my calculation.

"As to the second question—when his earnings would probably cease. I think at the age of sixty, is a fair supposition. When an income depends on manual labor, it lasts usually till near this age. Where it comes from brains or mental skill or dexterity, it lasts till after sixty.

"Counting, now, the mortality of Georgia at such a per centage above the European as I believe justified by experience; counting interest at seven per cent. per annum; counting the deceased's income at $2,250 00, the average of the $1,500 00, and $3,000 00 named in the question; counting this income to cease at the age of sixty; counting his portion of the expenditure for his own support at one-fifth of his

whole income, and counting that to be expended for his whole life, I find the loss to his family to be $17,672 00. If the jury shall be satisfied that his income is a larger or a smaller sum, this loss to be increased or diminished in proportion."

*Third Interrogatory.*—"In making this calculation or estimate, do you consider the question as equivalent to the purchase of a life-annuity of such person for same sum, or what is the difference?" *Answer.*—"I do not consider, for the reason already given, the value of an annuity of $2,250 00 for his life, the true measure of the pecuniary loss to his family. The value of such annuity would be $26,356 00."

*Fourth Interrogatory.*—"Would a sum of money, in gross, that would produce a certain life-annuity for such person for same sum, compensate pecuniarily for the loss of such life? If not, what is the difference, and why?" *Answer.*—"I think such a sum of money as would produce an annuity of $2,250 00, would more than compensate his family, for various reasons already given."

*Fifth Interrogatory.*—"In a life-annuity, the recipient takes the money himself, at the end of the year, and makes such disposition as he thinks proper. Now, in compensating for the loss of the life stated, ought not the consideration to increase the compensation that this person, whose intellect, capacity, and sagacity produces this sum in life, and puts into his business annually, increasing, to this extent, his profits and benefits to his family, while no such consideration affects the price for an annuity producing a like sum, and if this is true, what sum is equivalent to this additional consideration?" *Answer.*—"If the deceased had extraordinary skill in money matters, the jury would be justified in increasing my estimate. I merely count money worth legal interest."

As to Bartlett's Tables, etc., he said he knew nothing of them, and that no old tables, as the Northampton, Carlisle, or Swedish, nor modern tables, as "Dr. Farr's English," founded on the mortality of England and Wales, would suit exactly for the latitude of Georgia.

Upon cross-examination, he answered: "The constitution

Macon and Western Railroad Company *sv.* Johnson.

and health of a person have much to do with the duration of life.   My calculations above are based on the average of the whole community, good and bad.   The English tables of Dr. Farr are based on the whole population, sick and well, weak and sound.   My table of mortality is higher than this, because of our Southern latitude, nearly twenty-five per cent."

"I think a reliable estimate can be made of the value of an annuity on one's life without knowing his constitution. If the deceased was in good health—not meaning by this perfect health, or free from every complaint or disorder—not below the average health of the whole population of the State, I consider that his loss to his family was worth, at least, the sum named in my direct answer, $17,762 00, and that this valuation is founded on principles perfectly reliable. If the jury shall be satisfied that the deceased was in bad health, then I withdraw my calculation as not applicable. If he was in good health, whatever was his constitution, I consider my calculation reliable.   Millions and tens of millions of money are invested in the United States on just such calculations, and they are as safely invested as if put into State or railroad bonds."

To the 3d cross-interrogatory he answered :   "It is usual to have a medical examination of any person who applies for life insurance, or a life-annuity.   But it is not usual to reject the application for slight disorders.   I have had my own life insured when my application showed that I had been much troubled with dyspepsia, and without any extra charge. Piles, asthma, and hernia, and other diseases of slight character, do not prevent the acceptance of an applicant.   The tables of mortality which insurance companies use, include all such persons.   If only the perfect cases were taken, the rate of mortality would be below their tables and calculations.")

To the 4th cross-interrogatory he answers:   "I have no personal knowledge of the income or health of Arthur W. Johnson.   I only say, in my answers above, that, if he was in good health, and thirty-four years of age, and had an

income of $2,250 00 a year, the pecuniary loss to his family was $17,672 00, (seventeen thousand six hundred and seventy-two dollars."

To the 5th cross-interrogatory he answers: "I have nothing to add in favor of defendant, as I had nothing to add in favor of plaintiff. Knowing none of the parties, my answers relate only to abstract scientific questions, without reference to particular individuals."

The evidence being closed, the Court first gave to the jury a general charge, as follows:

This case is brought by plaintiff to recover of the defendant, damages for the killing of her husband, while a passenger on the cars of defendant. You have heard the evidence, and you are to determine the case from the evidence and the law as I shall give it to you. You are the sole judges of the evidence, and you are to sift it, and weigh it, and apply it to the law. If there is a conflict in the evidence, you are to reconcile it, and make it harmonize if you can. But if you cannot harmonize it, then scrutinize it, and give your credence to that part that is best sustained by other witnesses, and giving to the evidence of the witnesses that had the best opportunity of knowing, and are sustained by the greatest weight of other evidence.

Again, you are to disregard any and every consideration but the law and evidence. You are to be blind as to who are the parties, where they reside, or what are their necessities. Make your verdict speak the truth from the law and evidence as submitted to you.

This defendant was a carrier of passengers, and was bound to extraordinary diligence on behalf of itself and agents, to protect the lives and persons of its passengers. The defendant was obliged to furnish good and substantial and safe engine and cars, and good, competent and skillful engineers and other officers, agents and servants. If the defendant fails to furnish all these, and a passenger is injured in consequence thereof, the defendant is liable to the passenger for such damages as he can prove he has sustained.

If the jury believe, from the evidence in this case, that the

husband of the plaintiff was killed by the neglect of the defendant in providing any of these things; or, if they believe from the evidence, that the husband was killed by an extraordinary and unforeseen collision, which was the result of the negligence or want of diligence on the part of defendant, or its agents, and without any want of ordinary care on the part of the husband who was killed, then the plaintiff is entitled to recover. But the defendant is not liable to this plaintiff for the death of her husband, if the defendant has used such diligence as the law, as above given you, requires.

If you believe, from the evidence, that the plaintiff's husband was killed by his own negligence, or, if you believe he was guilty of gross negligence, then she, as his wife, is not entitled to recover. A railroad company is not liable for loss occasioned by a collision of its trains, if the company and its agents have used the extraordinary care required by the law, and the party injured was guilty of gross negligence, or could have avoided the injury by exercising such care and prudence as a prudent and careful man will exercise to avoid danger.

Again, I charge you, that the passengers on the cars are bound to conform to reasonable regulations, and if notice is given to them not to stand on the platform, they are bound to conform to the notice. This notice is given by being posted over the platform, and is given to notify passengers that the platform is a place of danger. The passenger being on the platform, may or may not prevent his recovery of damages while standing there. If the injury was the result of negligence of the company, or its agents, the injured passenger may recover, if he used ordinary care in trying to avoid the injury—but if he neglected to use such ordinary care to escape the injury, he is not entitled to recover.

If the plaintiff, by ordinary care, could have avoided the consequences to himself, caused by the defendant's negligence, he is not entitled to recover.

No person shall recover damages from a railroad company for injury to himself, where the same is done by his consent, or is caused by his own negligence. But if the plaintiff and

the agents of the company are both at fault, the former may recover, but the damages shall be diminished by the jury in proportion to the amount of default attributable to him for his negligence.

· He *read from Red. on R.*, 333; *from Pierce, Am. R. R. L.*, 475; 28 *Ga. R.*, 116; *Code, secs.* 2040, 2979, 2035, 2913, 2914; 24 *Ga. R.*, 366.

By the plaintiff's attorney, he had been requested to charge as follows:

1st. That a railroad company, in this State, is liable for any damage done to persons or property by the running of the locomotives and cars of such company, or for any damage done by any person in the employment or service of such company, unless such company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption, in all cases, being against such company. Code, sec. 2978. A carrier of passengers is bound also, to extraordinary diligence on behalf of himself and his agents, to protect the lives and persons of his passengers, and in case of accident and injury therefrom, it is incumbent on the company to show that such diligence was used, or they are liable. Code, 2040.

2d. That, if it appears from the evidence that there was a collision of trains on defendant's road as charged, and that the death of plaintiff's husband was produced thereby, the facts of collision and injury therefrom make out a *prima facie* case for the plaintiff, and cast the onus on the defendant to show that such collision was not the result of negligence, but was the result of unavoidable necessity, which the utmost skill, care, and foresight could not have prevented. Stokes vs. Salstanstall, 13 Peters, 191.

3d. A common carrier, in this State, cannot limit his legal liability, either by publication on the doors of cars or elsewhere, or by entry on receipts or tickets sold. He may make an express contract, and will then be governed accordingly. Code, 2041, 3280.

4th. If, by the rules of this road, (see rule 18, in rule book), conductors have the entire management of the trains

and the hands employed upon them, and the jury believe, from the evidence, that the conductor told the passengers that " there was no danger, that a man had been sent back to warn the rear train, and that all was safe," a failure on the part of said passengers to notice and obey warning given by other passengers (if such warning was given), does not show that such passengers were negligent of their own safety, or wanting in ordinary caution; that the train and passengers being under the exclusive management, care and control of the conductor, it is his duty to give the passengers notice of any real or apprehended danger, if in his power to do so; if the conductor fails to warn passengers under such circumstances, it does not show a want of ordinary care on the part of a passenger, if he neglects to place himself in a position to avoid a collision or a danger that is unknown or unseen by himself, upon the expressed apprehensions of other passengers, or of persons whom he does not know have authority on the train, or superior knowledge to himself, and of whose reasons for such apprehension of danger he is ignorant. In such a case, the passenger has a right to believe that the conductor is well informed, and would, if there was any real danger, notify his passengers of such danger, and provide for their safety. Laing vs. Colder et al., 2nd Am. Railway Cases, 380 ; Pierce Am. R. R. Law, 475.

5th. Common carriers of passengers are responsible for the slightest negligence resulting in injury to their passengers, and are required, in the preparation and management of their means of conveyance, to exercise the highest degree of skill and diligence which a reasonable man would use under similar circumstances. A railroad company is bound to provide skillful and careful servants of good habits, and, in every respect, competent for the posts they are to fill, such as engineers, brakemen, conductors, and signalmen, and is responsible not only for the possession of such care and skill, but also for *the continued application of those qualities at all times.* Pierce Am. Railroad Law, 470 ; Stokes vs. Salstanstall, 13 Peters, 181; Laing vs. Colder et al., 2 Am. Railway Cases, 381. And any failure to exercise the highest degree

of skill and diligence by such servants, when in the regular course of their employment, whether from a want of due skill, or an omission to exercise it, is gross negligence, and will render the company liable for any injury resulting to a passenger, although such servant may have, at the time, acted in disregard of the rules of the company, or in violation of express orders. Philadelphia and Reading Railroad vs. Derby, 14 Howard, 486.

6th. If there was imminent danger of a collision, and the conductor of the passenger train had reasonable ground to apprehend one, it was his duty to give notice to the passengers of his train of the approaching danger, and put them upon their guard, and more especially if his train was not in motion, and if the passengers had sufficient time to make their escape. The failure to give such notice was negligence, for which the defendant, in whose employment he was, is responsible. Laing vs. Colder *et al.* 2 Am. Railway Cases, 381. Redfield on Railways, 327, and note.

7th. If the plaintiff's husband was lawfully upon the railroad of defendant's as a passenger, to be safely and securely conveyed as such passenger from Macon to Atlanta, and while so conveying him the collision occurred by which the plaintiff's husband was killed, the defendant is liable for the injury.

8th. If the collision by which the plaintiff's husband was killed, was occasioned by the failure of the signalman sent back to warn the rear train, to go far enough back to stop it and prevent disaster, and said signalman had sufficient time for that purpose, the defendant is liable, although at the time he may have acted in violation of the orders of the conductor.

See charge of Mr. Justice Greer, Philadelphia and Read-in Railroad vs. Derby, 14 Howard, 470.

9th. The plaintiff's husband, in traveling upon defendant's train as a passenger, was not bound to anticipate or provide against danger not ordinarily incident to that mode of travel, or to place himself where he would be least exposed in case of a collision of trains. (Willis vs. Long

Macon and Western Railroad Company *vs.* Johnson.

Island R. R., 32 Barbour, 399,) and that *ordinary care* which every one is required to take of their persons to escape the consequences of another's act, is not such care as a very prudent or cautious person would take under different circumstances, but only that degree of care which may be reasonably expected from a person in the situation of the person injured, at the time of the injury; and if the plaintiff's husband had been assured by the conductor, or other agent of the company, just previous to the accident, that there was no danger, the jury are authorized to consider whether such assurance was or was not sufficient to quiet the apprehensions of a reasonable man, and cause him to neglect precautions he might otherwise have taken for his own safety. See Beers vs. Housatonic R. R. Co., 2 Am. Railway Cases, 114.

10th. The question of negligence is not a question of law, but one of fact, upon which the jury are to pass in making up their verdict; and if they believe, from the evidence, that the defendant's servants were grossly negligent on the night in question, and might have prevented the disaster by the exercise of proper care, skill and diligence, and have prevented loss of life by giving proper and sufficient warning to the passengers, and failed to do so, the plaintiff is entitled to recover, although her husband may have been guilty of slight neglect. See case referred to above.   Also, *Davis vs. M. & W. R. R. Co.,* 27 *Ga.,* 113.

### AS TO DAMAGES.

The widow is entitled to recover such damages as she has sustained by the loss of her husband, as well as such damages as the child or children may have sustained by the loss of their father, as against the person or corporation causing his death.   Code, 2913.   And if the jury believe, from the evidence, that the plaintiff is entitled to recover, they may give such damages as will compensate fully the plaintiff for the loss of her husband, which is *the whole value of his life;* they are to take into consideration, in computing the damages, what his life was shown to be worth by the

proof—the probable accumulations of a man of his age, habits, health, position in society, and pursuits, calling or occupation. If they can find a better rule, they are at liberty to adopt it. Pierce on American Railway Law, 261. Penn. R. R. Co. vs. McClosky, 23 Penn. State Rep., 526. Independently of the damages thus computed, the plaintiff is entitled to damages for the loss of the care, protection, and assistance of the husband and father. *Paulk's case*, 24 *Ga.*, 369.

In this case the widow recovers *"for the homicide"* of the husband ; the *damages* for which the right of action is given her, is *not the loss to her as wife* of the deceased, but the *damages caused* by the wrongful killing of her husband. The modification of the Act of 1850, (which vested the right of action in the administrator, and in case of insolvency, appropriated one-half of the recovery to the payment of the debts of the deceased,) by the Act of 1856, and by section 2913 of the Code, was not intended to *confer a benefit on the wrongful slayer*, but *on the widow*, in the first instance, and if no widow, or if dead before final recovery, then on *the child or children* of the deceased.

All these requests he charged, except the third.

The Court had been also requested, by the defendant's attorney, to charge as follows :

1st. If the jury shall believe the defendant, through his agents, exercised the extraordinary care and diligence required by law, to prevent the collision, the plaintiff can not recover.

2nd. If the jury shall believe that the defendant was negligent, but that the deceased could, by ordinary care, have avoided the consequences to himself, caused by the defendant's negligence, the plaintiff cannot recover.

3d. If the jury shall believe that both the defendant and the deceased were negligent, and the deceased could not, by ordinary care, have avoided the consequences to himself of defendant's negligence, then the plaintiff may recover, but the damages must be diminished in proportion to the amount of default attributable to the deceased.

4th. If the jury shall believe that the collision was caused by the negligence of the defendant; but that at the time of the collision the deceased was standing on the platform of the cars, and did not have notice of the approaching train, then the damages must be diminished, in proportion to the default attributable to the deceased.

5th. If the deceased, at the time of the collision, was standing on the platform, and had notice of the approaching train, and of the danger of a collision, and refused or neglected to abandon his exposed position when he could have done so, then the plaintiff cannot recover, and the jury, under their oaths, must return a verdict for the defendant.

### AS TO DAMAGES.

1st. If the jury shall believe the plaintiff is entitled to recover—she can not, as widow, recover from the defendant, more than, as a wife, she was entitled to receive from her husband, and under the law, she is entitled from her husband to support and maintenance according to the position and circumstances of the family in life.

2d. If "income" is the proper basis for the measure of damages, it is not a speculative or uncertain income, but a fixed income, based on the value of the deceased's services: and the rule for ascertaining the present value of a fixed and certain annuity, can not be applied to ascertain the present value of a speculative and uncertain income from trade.

All of which charges the Court gave as requested, except those " as to damages," which he refused, and charged, upon that question, as requested by counsel for plaintiff.

The verdict of the jury was for the plaintiff, for $7,775 00 and costs.

Thereupon each party moved for a new trial. The company complained that the Court erred, 1st. In holding that said interrogatory was not leading. 2d. In admitting said opinions of Adams. 3d. In rejecting the answer as to the general opinion of the passengers, etc. 4th. In rejecting said published card. 5th. In refusing to charge, as requested by them, as to damages, and in charging on that subject as

requested by plaintiff's attorneys. 6th. In saying, several times during the charge, "what gives me most trouble *in this case* is the question of damages." And lastly, because the verdict was contrary to evidence, etc. The record does not show that the Court used the remark quoted in said sixth ground.

Plaintiff's attorneys moved for a new trial upon the following grounds, to wit: Because the Court erred—

1st. In admitting to be read to the jury, as evidence against the objection of plaintiff, the statement of the witness, William H. Whitfield, "I do not suppose Messrs. Rogers and Johnson would have been hurt had they done likewise," (kept their seats).

Also, the statement of the witness, James W. White, against their objection: "It is my opinion he (Johnson) could not have been in his seat at the moment of collision, but was at the door, or on the platform." And also, in allowing all and any like statements of opinion of the other witnesses against the objection of plaintiff.

2d. In rejecting the written opinion of Professor Charles F. McKay, as to the measure of damages, and mode of ascertaining the same. (This must mean in not adopting it in the charge, for, as evidence, it was not rejected).

3d. In charging the jury, " If the jury believe, from the evidence in the case, that the husband of the plaintiff was killed by an extraordinary and unforeseen collision, which was the result of the negligence or want of diligence on the part of the defendant, and *without any want of ordinary care on the part of the husband who was killed,* then the plaintiff is entitled to recover." The Court should have charged the above principle, leaving out the words italicised. The Court also erred in still further qualifying said principle by adding thereto, " but the defendant is not liable to this plaintiff for the death of her husband, if the defendant has used such · diligence as the law, as above given you, requires."

4th. In charging the jury, " If you believe, from the evidence, that the plaintiff's husband was killed by his own negligence, or if you believe he was guilty of gross negli-

gence, then she, as his wife, is not entitled to recover. A Railroad Company is not liable for loss occasioned by a collision of its trains, if the company and its agents have used the extraordinary care required by the law, and the party injured was guilty of gross negligence, or could have avoided the injury by exercising such care and prudence as a prudent and careful man will exercise to avoid danger.

5th. In charging the jury, "Again, I charge you that the passengers on the cars are bound to conform to reasonable regulations, and if notice is given to them not to stand on the platforms, they are bound to conform to the notice. The passenger being on the platform, may or may not prevent his recovery of damages done while standing there. If the injury was the result of negligence of the company or its agents, the injured passenger may recover, if he used ordinary care in trying to avoid the injury, but if he neglected to use such ordinary care to escape the injury, he is not entitled to recover; if the plaintiff, by ordinary care, could have avoided the consequences to himself, caused by the defendant's negligence, he is not entitled to recover.

6th. In refusing to charge the jury, as requested by plaintiff's counsel, in writing, "That a common carrier in this State cannot limit his liability, either by publication on the doors of the cars or elsewhere, or by entry or receipts, or tickets sold. He may make an express contract, and then will be governed accordingly."

7th. In charging the jury, "That, if the jury shall believe the defendant, through his agents, exercised the extraordinary care and diligence required by law, to prevent the collision, the plaintiff can not recover."

8th. In charging the jury, "That, if the jury shall believe that the defendant was negligent, but that the deceased could, by ordinary care, have avoided the consequences to himself, caused by the defendant's negligence, the plaintiff can not recover."

9th. In charging the jury, "That, if the jury shall believe that both the defendant and the deceased were negligent, and the deceased could not, by ordinary care, have avoided the

consequences to himself of defendant's negligence, then the plaintiff may recover, but the damages must be diminished in proportion to the amount of default attributable to the deceased."

10th. In charging, " That if the jury shall believe that the collision was caused by the negligence of the defendant, but that at the time of the collision, the deceased was standing on the platform of the cars, and did not have notice of the approaching train, then the damages must be diminished in proportion to the default attributable to the deceased."

11th. In charging the jury, " That if the deceased, at the time of the collision, was standing on the platform, and had notice of the approaching train, and of the danger of a collision, and refused or neglected to abandon his exposed position when he could have done so, then the plaintiff cannot recover, and the jury, under their oaths, must return a verdict for the defendant."

12th. Because the verdict is contrary to the evidence.

13th. Because the verdict is contrary to the law, the weight of, and against, the evidence.

14th. Because the damage recovered is inadequate compensation for the injury sustained by plaintiff under the evidence submitted.

The Court refused to grant a new trial, and of this refusal both sides complained, and each here assigned as errors the said points in their respective motions for a new trial.

COBB & JACKSON, WHITTLE & GUSTIN, B. H. HILL, for the Macon and Western Railroad Company, made the follow-lowing points and citations of authorities: The company might reasonably require passengers to keep off the platforms of the cars, and passengers were bound to do so. Irwin's R. Code, sec 2043. *Mitchell vs. W. & A. R. R.*, 30 *Ga. R.*, 25. Pierce on Am. R. R. L., 248, 490. Redfield on R. Ways, 26, 348. If Johnson's negligence caused the damage, his widow cannot recover. Irwin's R. Code, sec. 2980.

In giving the charges as stated, and refusing to charge as

requested, as to the rule for estimating the damages, the Court erred.

In considering this question of the proper rule for assessing damages in cases of this kind, a brief reference to the legislation of the State on the subject will not be out of place:   Prior to the Act of 1850, (Cobb's Digest, 476), no recovery could be had by any one for a tort of this character. By that Act, the right of action was given to the "*legal representatives* of such deceased, to have and maintain an action at law against the person committing the act from which the death has resulted, one-half of the recovery to be paid to the wife and children, or the husband of the deceased, if any, in case of his or her estate being insolvent." This Act was subsequently amended, and by section 2920, (new Code), it is provided that, " A widow, or if no widow, a child or children, may recover for the homicide of the husband or parent; and if suit be brought by the widow or children, and the former, or one of the latter dies pending the action, the same shall survive, in the first case, to the children, and in the latter case, to the surviving child or children."

By this legislation, it appears that, at first, a right of action was given to the legal representatives of the deceased in such cases, *in part* for the benefit of the deceased's estate, and *in part* for the benefit of his wife and children, if he died insolvent.   By the last Act, the right of action is taken away from the legal representatives, and the cause of action, *as far as the estate is concerned*, is put upon a footing with all other torts, and does not survive to his representatives.   This last provision of the law looks alone to the widow, and if no widow, to the child or children, husband or father.

This view is sustained by the high authority of the English Courts, construing the Act 9 and 10 Victoria, which is very similar in its provisions to our own law.   There, the right of action is given to the legal representative, but it is *for the benefit* of the family.   In the case of Blake vs. Midland Railway Company, 83, English Common Law Reports, the income of the deceased was calculated at £850 a year. "The learned Judge suggested to the jury, as a mode of estimating

the pecuniary loss, to take so much per annum *of that sum as a wife living with her husband, and maintained according to her station in life, might be supposed to enjoy.*" The jury found a verdict of £4,000. A new trial was granted, on the ground that the damages were excessive. The same doctrine was held by the Supreme Court of Pennsylvania, that the widow could recover the pecuniary loss sustained by her, viz: "a reasonable support and maintenance for herself." Pennsylvania Railroad Company vs. Kelly, 31 Pennsylvania State, 373. The same plaintiff vs. Zebe *et ux.,* Id., 318. The Court erred in saying to the jury, in his charge, "What gives me the most trouble *in this case,* is the question of damages," and repeating the same several times. 9 *Ga. R.,* 335; 30 *Ga. R.,* 241.

The Court erred in ruling out the said card of the passengers. This card should have been received as a part of the "*res gestæ.*

LYON, IRWIN, B. HILL, for Mrs. Johnson, as to passenger standing on the platform, cited Wells vs. Long Island R. R., 32 Barber's N. Y. R, 405 ; *Mitchel vs. W. and A. R. R.,* 30 *Ga. R.,* 22; Stokes vs. Salstanstall, 13 Peters R.; *Paulk's adm'r vs. So. W. R. R. Co.,* 24 *Ga. R.,* 265; Pierce on R. R., 476 ; Redfield do., 433 ; Carroll vs. N. Y. and N. H. R. R., Duer's R., 571 ; 9 Rich. R., 86. They reviewed the statutes and authorities cited by the company's attorneys as to the rule for damages, and cited 5 Wallace R., 90 ; Pierce's R. R. L., 258, (note 1), 261 ; Penn. R. R. Co. vs. McClosky, 23 ; Penn. State R., 526, and *Paulk's adm'r vs. So. W. R. R. Co.,* 24 *Ga. R.,* 365.

McCAY, J.

This case comes before the Court on a double bill of exceptions. The verdict was for the plaintiff. The defendant moves for a new trial, on the ground, first, of error in the Court in admitting and in excluding testimony, but mainly on the ground that the Court erred in his charge to the jury as to

the measure of damages, and on the ground that the verdict of the jury was contrary to the evidence.

The plaintiff moves for a new trial on several minor grounds, but mainly on the ground that the Court erred in charging the jury, (this being a suit against a railroad company for the homicide of a passenger,) that the plaintiff could not recover if her husband, by the exercise of ordinary care, could have avoided the consequences to himself of the defendant's negligence.

1. It is true that there is a special title in the Code, sections 2978 to 2985, concerning damages by railroads, and that there are several more stringent rules provided against railroad companies, regulating their liability for damages, than are provided against individuals. We do not, however, see any reason why the general principles contained in sections 2917 to 2921, should not apply to physical injuries by railroads. Indeed, it is from section 2920 that the plaintiff in this case gets her right to recover at all. The rule, section 2921, "If the plaintiff, by ordinary care, could have avoided the injury to himself, caused by the defendant's negligence, he cannot recover at all," applies, in our opinion, to all cases, and it is a wise and just rule.

The man who neglects ordinary care to *avoid* an injury, has no just right to seek redress, if that injury is produced by the negligence of another, and we see nothing in the character of a railroad company which should subject it to damages for an injury caused by the neglect of its agents, where the person injured might, by the exercise of ordinary care, have *avoided* the consequences to himself. It is objected that this is a harsh rule, and it is even contended, that, though in the Code, it is not law, because beyond the power of the compilers, who were not authorized to *make* law. It is sufficient for this, to say, that both the Constitutions of 1865 and 1868 adopt the Code, and it is not worth while to discuss the extent of the powers of the compilers. Nor is this rule less hard upon the defendant than was the common law. Mr. Pearce, American Railroad Law, 272, announces it as a general principle of the common law, "That the rule resulting

from all the authorities is, that a party suffering injury by a collision, cannot recover if he was himself chargeable with a want of ordinary care, and thereby contributed to the injury. And in Laing vs. Colder, 8th Barr, it was decided, "That the company is not chargeable for an injury to a passenger which would not have occurred but for his own negligence, or to which his own negligence substantially contributed, notwithstanding the company itself is chargeable with a breach of duty."

Our own Courts, previously to the Code, had substantially adopted the same rule, and in 19 *Ga. R.*, 440, this Court, in effect, announces the rule as it exists in this section of the Code.

Our Code, sec. 2970, requires a railroad company to prove, affirmatively, diligence on its part, and declares that the presumption is, in all cases, against the company. It also provides, sec. 2980, that "if the complainant and the agents of the company are both at fault, the former may recover, but the damages shall be diminished by the jury, in proportion to the amount of default attributable to each of the parties."

The common law rule was, that however negligent the defendant may have been, yet, if the negligence of the plaintiff *contributed* to the injury of the plaintiff, he was without remedy. Sedgwick on Damages, 468.

There could be at common law no apportionment of damages. See cases cited, Pierce on Am. R. R. Law, 272–275; Angel on Carriers, 642. A wrong-doer himself, who has contributed to an injury sustained, can not ask for redress. 8 Man., and Gran & Scott, 114.

2. Our Code, however, in the case of railroads, adopts a different rule, and provides, in certain cases, for an apportionment of the damages according to the fault of both parties. This, as is said by Judge Benning, in 26 *Ga.*, 250, was the English Admiralty rule, and, taken in connection with the rule in sec. 2921 of the Code, is wise and just. As a matter of course, these rules are to be taken together. Mere want of ordinary care, on the part of the plaintiff, will not relieve the defendant, unless *he* be totally free from fault. Taken

together, as we understand the two sections, sec. 2921 and sec. 2980, the rule in Georgia is this: "If the plaintiff, by the exercise of ordinary care, could have *avoided* the consequences to himself of the defendant's negligence, he can not recover at all. But in other cases, (that is, in cases where, by ordinary care, he could *not* have avoided the consequences of defendant's negligence,) the circumstance that the plaintiff may have, in some way, contributed to the injury sustained, shall not entirely relieve the defendant, but the damages shall be apportioned according to the amount of default attributable to each. And it seems to us, that the Code thus happily settles a subject upon which there has been some conflict of opinion, and no little display of learning and argument.

3. We have not been able to agree with the Court below as to the rule to be adopted for estimating the damages which the wife has suffered by the homicide of the husband. This is a new question not only in Georgia, but wherever the common law is in force. The right to sue at all, depends upon the statute, and the rights of the parties must turn upon its terms. Our first Act gave the right to sue to the administrator, and enacted that, if the estate was insolvent, one-half the recovery should be paid by him to the wife and children. Act 23d February, 1850. The Act of 1856, declared the right to vest in the wife, if any; if not, in the children, and if none, in the legal representatives.

Under these Acts, we are inclined to think it was the intention of the Legislature to give a remedy for the full value of the deceased's life. But the Code drops the legal representatives altogether, and gives the right only in case of the homicide of a *husband or parent*, and only to the widow, or, if none, to the children. Code, sec. 2920. This change in the law is significant. Why is no remedy given, except in case of the death of a husband or parent, and why are the representatives dropped? Simply, as it seems to us, because it was intended only to give to the wife damages for *her* loss, or, if no wife, then to the children, for *their* loss. What, then, is the loss of the wife? Her legal loss? It is that

which she was, by law, entitled to from her husband, a reasonable support, according to his condition in life. We are aware that this is but a poor compensation for the loss of a loved one. But would any pecuniary rule meet the actual damages? We trow not, and we do not suppose anything was intended, by the Legislature, but to supply the loss to the wife of her actual legal rights, by the death of her husband. Anything more than this, would set us adrift, without chart or compass. The real value of a life, is incalculable, and its actual money-value is all that can be estimated. But neither the wife nor the children have any legal *right* in the earnings of the husband or parent, except for a reasonable support, according to his condition in life. He may, it is true, give them more, or, if he dies without disposing of his estate, they will inherit it. But they have, in law, no pecuniary interest, no legal right in his property, except, as we have said, for a reasonable support, according to his condition in life. This, they have a right to demand, and this, in our judgment, will, upon the whole, best satisfy the peculiar language of the Code, and the history of the legislation in this State on this subject. In estimating the damages, therefore, in a case where the wife is suing for the homicide of her husband, who was without fault, the jury are to inquire what would be a reasonable support for the wife, according to the circumstances in life of the husband, as they existed at his death, and as they may be reasonably supposed to exist in the future, in view of his character, habits occupation, and prospects in life, and when the annual money-value of that support has been found, to give, as damages, its present worth, according to the expectation of life of the deceased, as ascertained by the mortuary tables of established reputation. This rule, as we believe, will approach nearly to a means of measuring the actual legal money-value of the life to the wife, though we do not pretend that it will, at all, compensate her for the loss of her husband—that, money, to any amount, cannot do, and it is vain to attempt it.

We have said nothing as to the children, and are free to

say that their *status*, in an action of this kind, has given us much trouble. In the estimate of damages, ought they to be considered? The statute is not clear upon the subject. If the widow recovers, she recovers in her *own name*, and she holds the recovery in her *own right*. The children have no claim upon it. She may marry, and thus convey it to a stranger, or dispose of it at her pleasure. Why should any claim of theirs be considered in a suit by the wife? On the other hand, if there be no widow, the children may sue, and if she die pending her action, the *same* shall survive to the children. Code, sec. 2920. And it is also true that, by the homicide of the husband, an additional moral, if not legal, duty is cast upon her for the support, at least, of minor children. In the decision of the Court, at the head of this opinion, we have said nothing about the child or children, believing that, in a suit by the wife, *her* loss is the only matter for consideration. The statute is very meagre in its provisions. It does not provide full remedies, and we do not feel authorized to extend it beyond its terms. We hope the Legislature may make the law, upon this subject, more precise. What is so uncertain as children? Does it mean minor children only, or all children? In a matter of such importance, the law ought to be clear, and as the right here given, is one wholly the creation of the Legislature, we hope it may be more accurately defined by that body. On principles of justice, the widow and children stand on the same footing; yet, as the right of action is given only to the widow, the recovery will be for her sole benefit. We do not feel, therefore, that the rights of the children, or the damage to them, where the suit is by the widow, is matter for consideration.

4. An experienced railroad man, who has made the management of cars, engines, etc., his business for years, is as fairly an expert as one skilled in any other art, and his evidence stands upon the same footing. We think, however, that the explanation by Mr. Adams, of the meaning which the railroad companies with which he had been connected attached to the notice that "passengers must not stand on the platform," was not proper evidence. The words stand

for themselves. Suppose he had undertaken to explain by stating that they meant something more, instead of something less than their plain import. Ought that, too, to be evidence? The facts of this case show that the platform is not a safe place, even when the car is not in motion. The old rule is the safe one. Let the words speak for themselves. If the door is opened at all, there is no limit. 1 Greenleaf Ev., sec 280.

5. The precise position of Mr. Johnson, at the moment of the collision, is not positively known. He was found on the ground; he had been on the platform very shortly before. The witnesses stated the facts, where they saw him and where he was found. It is sometimes very difficult to draw the line between what is evidence, as a fact, and what is a conclusion of the witness. Much of what we state as fact, is, in truth, only the conclusion of our minds from very conclusive evidence. The statement that a man remained an hour in a room, may safely be made by one who saw him go in and come out, and who, having good opportunities, failed to see him come out in the mean time, and yet after all it may be, and is, a mere conclusion. We think the *opinion* of the witness is not evidence. If the witness *state* the presence of the deceased on the platform, at the moment of the collision, *as a fact*, and it afterwards appear that this is only his conclusion, from his presence there immediately before and his position afterwards, we think his evidence ought not be excluded. His statement of the *fact* is weakened, it is true, but it is often very difficult to draw the line, when, in such a matter, fact ends and opinion begins. We do not think there is any danger that the jury should be misled. If his statement is only given as opinion, it is inadmissible.

6. The card was, without doubt, inadmissible. All the parties to it were competent witnesses. It might be used, perhaps, to contradict or qualify the evidence of any witness who signed it, if proper foundation was laid, as in case of other statements, but not as original evidence. We know of no rule that justifies its admission. It is not even the state-

ment of one of the parties to the issue.   As a part of the *res gestœ*, it must have been *during* the occurrence, or so nearly coincident as to be free from all suspicion of after thought.   Code, sec. 3720.   *This* was next day, and after much dispute and crimination, and, as the other evidence shows, *against* the *first* impressions of the passengers.

7. The liability of a common carrier, for injury to a passenger, is somewhat different from his liability for goods. The latter he stores away at his own discretion, the former is a sentient being, and has certain duties of his own to perform. The company may make reasonable rules to regulate the conduct of its passengers, and it is the duty of passengers to comply with those rules.   Code, 2043.   More especially is this true, when the rule is for the passenger's own safety. The platform, as is plain to the meanest capacity, is not made to stand upon.   The company provides seats, and a shelter for its passengers, and the platform is, as to them, but the passway to their proper place; and it is a reasonable and proper rule, which the company may prescribe, that passengers should not stand upon the platform.   It is a rule for the railroad's own convenience; passengers are in the way, a hindrance to the proper management of the train, in that position.   It is also true, that it is a place of danger.   Whilst the cars are running it is emphatically so, but even when the cars are not in motion, it is an unsafe place.

8. The evidence of the notice was very strong; sufficient to cast the *onus* of want of knowledge on the plaintiff.   Indeed, at this day, considering the familiarity of all classes with railroads, and the evidence which the very nature of the case offers, it would seem that, *prima facie*, every person ought to know that the platform is not a passenger's place, except to pass over.   Suppose one were to stand on the steps, or mount the railing, or get on the top of the car, would not the presumption be against him?

We cannot but think that the jury in this case have not given due consideration to the negligence of the deceased. The evidence is conclusive that he was on the platform, and that his position was, in fact, the occasion of his death.   There

is evidence, too, that he was warned *by one of the company's employees* of the impending danger, in time to have avoided the consequences ; others did avoid it, under the same warning. We are not disposed, however, to hold a man, under such circumstances, to the same coolness and wisdom of action as after the event, and as calm spectators, we may think we would have made use of. Something, perhaps much, must be allowed for alarm and confusion and temperament. We do not, therefore, hold that, under the evidence, it is clear he could have avoided, by ordinary care, the consequences of the defendant's negligence. We do think, however, that though the company was at fault, the deceased was also very careless, nay reckless. He had no business on the platform, it was a place of danger, and always is. It was known to him that a train was coming. He was warned by several of the danger, and ordered by one of the company's employees to get off, as danger was imminent.

9. After the warning, and after he heard the coming train, a passenger went into the car, got his valise, came out, again warned the deceased, got off the train, went to the side of the track, saw the coming train, and again, in a loud voice, gave warning ; and yet, deceased, foolishly or recklessly, stood his ground. It is, too, a significant fact, that he had been drinking, and was on the platform, with his hat off. We think both parties were at fault, and, under sec. 2980 of the Code, the damages ought to be diminished by the jury, in proportion to the fault of each. We do not think the jury has done this. We would not measure their verdict with accuracy. The jury are the judges of the facts, and it is only when they are so wide of the mark as to indicate passion, mistake, or some error, based upon misunderstanding of law, that a court ought to interfere. We think, in this case, under the evidence, as it is before us in the record, the jury have either mistaken the law, or have acted under the influence of passion, natural, perhaps, in view of the parties, but still, illegal. In view of all the facts, and of the law, as we understand it, we think the verdict is wrong, and the damages, under the evidence, excessive.

Judgment reversed.