(38 South. 421.)

No. 15,438.

SHAMBLIN v. NEW ORLEANS & N. W. R. CO.

(March 27, 1905.)

CARRIERS—INJURY TO PASSENGER—CONTRIBUTORY NEGLIGENCE.

A freight train, in the caboose of which plaintiff was a passenger, having stopped to do some switching, plaintiff, without necessity, left his seat, where he would have been safe, and walked to the door, when he was knocked off his feet by a jolt caused by the making of a coupling, and was injured. The evidence showed that, when such couplings were being made, jolts, such as might throw persons standing in the caboose off their feet, might be looked for, and that a warning of this danger, in large, glaring letters, was posted on the wall of the caboose, and that the plaintiff was in the habit of riding in the caboose. *Held* that, both from his having ridden before in the caboose, and from the posting of the notice, plaintiff must be presumed to have known of the danger, and that, even though the coupling was negligently made, yet plaintiff cannot recover, because his act in standing up was one of the proximate causes of the accident, and was negligent, constituting contributory negligence.

(Syllabus by the Court.)

Appeal from Eighth Judicial District Court, Parish of Franklin; David Newton Thompson, Judge.

Action by James W. Shamblin against the New Orleans & Northwestern Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed.

Hudson, Potts & Bernstein, for appellant. Ellis & Dorset (Bernard Titche, of counsel), for appellee.

PROVOSTY, J. The plaintiff was a regular passenger in the caboose of one of the freight trains of the defendant company. The train stopped to pick up a car which stood on a spur track ahead. The front part of the train, consisting of 18 loaded cars, went forward, leaving the caboose and five cars, also loaded, standing on the main track. After going into the spur, which was some 250 to 300 feet ahead, the train backed down upon the standing cars to couple to them. The time it took to do this appeared long to plaintiff and his son, as they sat in the caboose. They got up and walked to the rear end of the caboose, to try to ascertain, they say, the cause of the apparent delay. Just then, and while plaintiff was standing near the door, and his son back of him, the sudden movement of the caboose, from the impact of the forward cars, in the making of the coupling, threw both men to the floor; and plaintiff, in falling, put out his arm, and, falling upon it, broke it. For this injury he brings this suit in damages, claiming that it was the result of the negligence of the employés of the defendant company in bringing the train against the stationary cars with unnecessary force. Defendant denies that the coupling was negligently made. and, in the alternative, pleads that, even if there was negligence, plaintiff cannot recover, because his standing up in the caboose, instead of keeping his seat, when he knew that a coupling was about to be made, was contributory negligence.

Whether the coupling was negligently made is left by the evidence in some doubt. Plaintiff says that he was accustomed to riding in the caboose of a freight train, and that the "lick" given to the caboose on that

occasion was unusually hard; that the train must have been going 30 miles an hour. The son, 23 years old, testifies:

"I don't believe I ever witnessed as hard a jar for the purpose of coupling. I have seen some pretty hard jars, too, but never one hard enough to knock me down."

This witness admits that he knew it was unsafe for passengers to stand or walk about in the caboose of a freight train while in motion, but says that the train was not in motion. He also knew that the coupling might be made at any moment, but says that he expected a signal. Plaintiff's witness Rollison, who was standing within 10 feet of the track, does not say that the coupling was made with unusual violence. To the question, "What rate of speed was it traveling?" he answered:

"I wasn't paying any attention to it at all until the brakeman and conductor went in there and went to work."

Further on he says:

"I don't know anything, except that when the cars hit together I was looking down on the ground, talking with Mr. Tarver, and when I looked up the car was running apart, with one drawhead driven up."

He had testified in chief that "when the engineer came back to make the coupling he came at such speed that he drove the drawhead out," and also that the caboose rolled back 10 or 15 feet. This witness' testimony is merely inferential, and the main basis of his inference (the driving "up" or "out" of a drawhead) is pure assumption, no drawhead having been driven in or up or out, but only a worn-out coupler key driven out—a not unfrequent occurrence, it seems. Plaintiff's witness Smith testifies that the breaking of these keys is frequent, and that heavy jars are of common occurrence in coupling trains; that it is considered unsafe for passengers to walk in the caboose while the train is in motion or switching; and that a notice to that effect is posted conspicuously on the wall of the caboose. This witness also says that a train of 23 loaded cars requires about a mile or a mile and a half to get under full headway, and that such a train cannot acquire much speed in two or three hundred yards. Plaintiff's witness Tarver was standing within 50 feet of the track. To the question, "Just say what happened?" he answers:

"All I know, the train made a switch in there to get a box, and when they got it they went to couple it, and they made the coupling, and they broke some part of the drawhead in one of those cars. I don't know what part, but I know it was broken."

On cross-examination he said that for making the coupling the train was "moving tolerable fast." "Why, I suppose I could call it faster than they usually go. This is, from the way I have noticed."

In behalf of defendant, the conductor testified that the train backed at the rate of about four miles an hour—about as fast as a man walks—and that the jolt was not unusually hard; that nothing was broken or injured in the coupling; that a badly worn key of the seventh car jumped out; that a supply of such keys are kept in the caboose in anticipation of such a contingency; that it is dangerous to stand in the caboose while the train is moving or switching; that a printed warning to that effect was posted on the wall of the caboose, "right where the plaintiff could see it." This warning is brought up in the record. It is a piece of buff-colored card-board 9x12 inches, on which is printed, in heavy faced, glaring, black letters, of approximately an inch and a quarter. the word "Danger," and just above, in letters somewhat smaller, but equally heavy faced, the words "Warning Notice." Below the word "Danger" is the following:

"Passengers are forbidden to occupy the movable seats, or stand up in this car, while it is in motion, or while switching is being done."

The conductor further testified that the usual warning signal was given by the ringing of the bell. He also testifies that at the proper time he gave the signals to back up

and to stop; that the engineer obeyed the signals; that the train was checked 60 feet from the stationary cars; that he was paying attention to the coupling; and that no unusual blow was given. He also testifies that a person paying ordinary attention would have heard the repeated jars as the slack went out from car to car. He also testified that the stationary cars and caboose did not roll at all under the impact of the train, but that, in order to allow the replacing of the coupler key, the train was uncoupled and moved 10 or 12 feet. The engineer testified that the coupling was not made with unusual force; that the caboose was not backed; that the bell was ringing as the train was backing; that it is not customary to sound the whistle; that the speed was about as a man walks. The brakeman who stood between the cars to make the coupling testifies that the speed was not unusual; that, if it had been, he would not have gone between the cars to make the coupling; that the key which jumped out was worn. The joint agent of the defendant railway and of the St. Louis, Iron Mountain & Southern Railway at Collinston testifies that there is decidedly danger in standing in the caboose while the train is moving or switching, and that that is the reason why the glaring notice of danger is posted in the caboose; that, if there are several cars attached to the engine, there is frequently considerable jar. The brakeman who opened the switch of the spur testified that the train was not backed up faster than usual. The fireman testified that the train moved at about four miles an hour, that he was ringing the bell, and that it is not customary to sound the whistle.

Plaintiff recalled the engineer, making him his witness, and asked him whether he had not said that the train was running at the rate of 10 miles an hour; and the witness answered, "No, sir; I did not." Thereupon plaintiff called witnesses who testified that on the day before the trial some one had asked the witness, "Didn't he hit them cars about 40 miles an hour?" and that he had answered, "No; I hit them at the rate of about 10 miles." These witnesses did not know whether this question and answer had been jocular or serious.

The witness Rollison, on being recalled by plaintiff, testified that the conductor, as he stood between the uncoupled cars, made the remark, "He didn't know what in the devil the fellow meant by trying to tear up things;" alluding to the manner in which the engineer had backed the train. The witness Tarver, recalled for plaintiff, testified that he heard the conductor make a complaint about the engineer having "come in there too hard."

Were it not for this testimony as to this comment of the conductor on the manner in which the coupling had been made, there would be no doubt at all that the coupling had been unattended by any negligence. The fact that the two men were thrown off their feet, and that another man was thrown out of a chair, which plaintiff's learned counsel looks upon as itself proof of recklessness in the handling of the train, is nothing but what might be expected at any moment in the caboose of a heavy freight train. The schedule time of the train was 18 miles an hour, and the testimony is that to get this train under full headway would have required a space of 3 miles, whereas the space between the stationary cars and the point from which the train started towards them was barely 300 feet. In view of these facts, the statement of plaintiff that the train must have been moving at 30 miles an hour would not have been very much more extravagant if it had fixed the speed at 100 miles an hour; also, in view of these same facts, the question to the engineer, whether he struck the caboose at 40 miles an hour, was foolish, if not meant to be jocular; and the answer of the engineer must have been jocular, for-

it was contradictory of his statement in his official report, and also of the testimony which he had come for the express purpose of giving. Defendant asked that the case be reopened for the purpose of affording an opportunity to prove that the question and the answer had both been meant as a joke, and the request was refused. It is noteworthy that, having made the witness his own, plaintiff was bound by his answer to the effect that he had made no such statement.

The remark of the conductor that he did not know what the engineer meant by tearing up things may have been the thoughtless utterance of a man giving vent to his ill humor at a perhaps avoidable accident, which kept him that much longer away from his home on New Year's Day morning, or it may have been an expression of opinion, on the spur of the moment, by the very man under whose direction the coupling operation was conducted, who, of all those present, was best qualified, by opportunity for observation, and probably by expert knowledge, to form an opinion in the premises. If it were the latter, our conclusion would have to be that the train was not handled with due care, and that, considering the high degree of care required of a railroad carrying passengers, the defendant was primarily responsible.

We shall leave the question open, as there is another and a sure ground upon which the case may be rested, even assuming that the defendant was negligent. It is that the plaintiff contributed to the accident by his own negligence in remaining standing in the caboose at a time when a coupling might be made at any moment, and that this contributory negligence precludes recovery.

Plaintiff admits that if he had remained seated he would not have been injured. Therefore his act of leaving his seat and standing was one of the proximate causes of the accident, and, under well-settled law

(Rapalje, Dig. vol. 2, p. 440), precludes recovery, if it was done negligently; that is to say, if it was done without necessity, and with knowledge, actual or presumptive, of the danger. That it was done without necessity, the record leaves no doubt. Plaintiff assigns no reason for it, except that he wanted to ascertain the cause of the delay, and neither he, nor anybody else, says that the delay was unusual. Nor is there more room to doubt that plaintiff knew of the danger. He was in the habit of riding in the caboose of this same freight train, and the proof is abundant that, whenever the train was in motion or switching, passengers in the caboose had to look for jars and jolts such as might throw them off their feet, no matter how carefully the train was handled. Moreover, there was posted on the wall of the caboose, "right where he could see it," a notice, in large, glaring letters, warning him of the danger. He does not say he did not know of the danger. If he did not, the burden was on him to prove the fact. Macon & W. R. Co. v. Johnson, 38 Ga. 409. We much suspect that the impatience of plaintiff and his son to get home on the New Year's Day morning made the time seem long to them, and that the exhilaration they had imbibed made them oblivious or reckless of the danger.

In the case of Krumm v. St. Louis, I. M. & S. Ry. Co., 76 S. W. 1075, the Supreme Court of Arkansas held (syllabus), as follows:

"One standing in the caboose of a moving freight train, which contained in a prominent position a warning to passengers against standing while the train was in motion, was guilty of negligence contributory to his injury, and barring a recovery therefor, though he had risen to get a drink, and was waiting for the water to be cooled."

In the case of Harris v. Hannibal & St. J. R. Co., 1 S. W. 325, 58 Am. Rep. 111, the Supreme Court of Missouri approved an instruction given in a former case as follows:

"If the jury believe from the evidence that plaintiff knew, or by the exercise of ordinary care could have known, that the train had stopped to do some switching, and by the exercise of ordinary care could have known that a part of the train was likely to be backed against the part to which the caboose was attached, and that some concussion or jar would likely be produced in the caboose, and that the plaintiff then, without thinking about the approach of the cars, and without paying any attention as to whether the cars were approaching or not, left his seat, and stood up in the car, and was thrown down and injured, when he would not have been, had he kept his seat, or resumed the same before the cars struck, then the plaintiff was guilty of such contributory negligence as bars his recovery, and the jury must find for defendant."

There is nothing opposed to this in any of the cases cited by plaintiff. Nothing that is here said tends in the slightest degree to relax the stringency of the rule exacting the highest degree of care in railroads carrying passengers, whether on freight or on regular passenger trains. The law in that connection is well stated by Judge Hooker, as organ of the Supreme Court of Michigan, in the case of Moore v. Saginaw, T. & H. R. Co., 115 Mich. 103, 72 N. W. 1112, cited by plaintiff:

"One who takes passage upon such a train, where the object and principal business is the transportation of freight, cannot insist upon the same equipment as is usual upon regular passenger trains. He will be presumed to understand that different cars and couplings and brakes are used, and that cars must be coupled and uncoupled and shifted in the course of yardwork at the various stations; that jars and jolts and jerks and concussions are incident to the ordinary management; and that these necessarily affect the equilibrium of persons standing in the car. We may take judicial notice that it is difficult, if not impossible, to handle trains of varying length and weight upon roads of varying grade without concussions; and passengers must be expected to know this, and assume the risks incident to such methods, where the crew handles the train with the highest degree of care which good railroading requires and permits under the circumstances. But if a less degree of care is bestowed upon the management of the train, it is negligence; and, if a passenger is injured thereby, without being in fault himself, the company is liable."

In the instant case, plaintiff was at fault.

Judgment set aside and suit dismissed, with costs in both courts.